UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA            *ORIGINAL*

Before The Honorable HAYWOOD S. GILLIAM, Judge

| | | |
|---|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., | ) ) ) | **Claims Construction Hearing** |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 16-00119 HSG (KAW) |
| DROPBOX, INC., | ) ) | **Pages 1 – 100** |
| Defendant. | ) ) ) | Oakland, California Wednesday, November 1, 2017 |
| SYNCHRONOSS TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 16-00120 HSG (KAW) |
| EGNYTE, INC., | ) ) | |
| Defendant. | ) ) ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          Dentons US LLP
                        1900 K Street, NW
                        Washington, DC  20006-1102
                  BY:   MARK L. HOGGE,
                        NICHOLAS H. JACKSON, ATTORNEYS AT LAW


Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## **A P P E A R A N C E S (CONT'D.)**

```
For Plaintiff:          Dentons US LLP
                        1301 K Street, NW
                        Washington, D.C.  20005-3364
                  BY:   SHAILENDRA K. MAHESHWARI,
                          ATTORNEY AT LAW


                        Dentons US LLP
                        One Market Plaza
                        Spear Tower, 24th Floor
                        San Francisco, California  94105-1101
                  BY:   SARAH S. ESKANDARI, ATTORNEY AT LAW

Also present:           Leighton Ridgard, Principal Architect
                        Synchronoss Technologies, Inc.




For Defendant           Williams & Connolly LLP
Dropbox, Inc.:          725 Twelfth Street, NW
                        Washington, D.C.  20005
                  BY:   ANKIT BAHRI,
                        ADAM D. HARBER,
                        THOMAS H. L. SELBY, ATTORNEYS AT LAW


                        Taylor & Patchen, LLP
                        One Ferry Building, Suite 355
                        San Francisco, California  94111
                  BY:   KARAN SINGH DHADIALLA,
                        JONATHAN A. PATCHEN, ATTORNEYS AT LAW




For Defendant           Meyertons Hood Kivlin Kowert & Goetzel
Egnyte, Inc.:           1120 S. Capital of Texas Highway
                        Building 2, Suite 300
                        Austin, Texas  78746
                  BY:   RYAN T. BEARD, ATTORNEY AT LAW



                        --o0o--
```

```
1   Wednesday, November 1, 2017                        10:02 a.m.
2                        P R O C E E D I N G S
3        THE CLERK:  We're calling C16-00119, Synchronoss
4   Technologies versus Dropbox, Inc. as well as 16-00120,
5   Synchronoss Technologies versus Egnyte, Inc.
6        Please step forward and state your appearances for the
7   record, please.
8        MR. HOGGE:  Good morning, Your Honor.  For
9   Synchronoss, this is Mark Hogge, and with me today is Nicholas
10  Jackson, Shai Maheshwari, Sarah Eskandari, and as our
11  corporate representative inventor Leighton Ridgard.
12        THE COURT:  All right.  Good morning, Mr. Hogge.
13        MR. HARBER:  Good morning, Your Honor.  Adam Harber
14  of Williams & Connolly for Dropbox.  Along with me on behalf
15  of Dropbox is Tom Selby, Ankit Bahri, and Jonathan Patchen and
16  Karan Dhadialla from Taylor & Patchen in San Francisco.
17        THE COURT:  All right.  Morning, Mr. Harber.
18        MR. BEARD:  Good morning, Your Honor.  Ryan Beard on
19  behalf of Egnyte, Inc.
20        THE COURT:  Morning, Mr. Beard.
21        All right.  So we're here for the claim construction
22  hearing.  We've got three hours allocated.  What I would
23  anticipate is we'll do it term by term and the sides can
24  alternate.  About 90 minutes in, we'll take a five-minute
25  break or so so that our court reporter can get a rest.
```

1        Ready to proceed?

2              **MR. HOGGE:**  Yes, Your Honor.

3                    (Off-the-record discussion.)

4              **MR. HOGGE:**  So we'll proceed claim term by claim term

5        so we'll -- what we have are groupings Your Honor.

6        I -- I've taken your admonition in your standing order

7        ground rules that PowerPoints are strongly discouraged, so I'm

8        prepared to proceed without any slides if that's your

9        preference.

10             **THE COURT:**  Sounds fine.

11             **MR. HOGGE:**  That said, I'm going to follow a format

12       that was given to me.  I've not done a *Markman* before Your

13       Honor, but I have done *Markman*'s here before in this court.

14       I'm going to follow a format for the presentation for

15       my -- for our presentation dictated by Judge Hamilton and

16       Judge Illston, and they've got kind of a straight-jacket kind

17       of procedure so I'm going to follow that.

18       I do have a slide deck that I can offer hard copy or soft

19       copy afterwards, whatever your preference is.

20       Now, before I delve in, do you have any preferences or

21       areas of focus or we'll just proceed linearly?

22             **THE COURT:**  I think just proceed linearly.  I have

23       questions about some of the terms, and I'll raise those as we

24       get to them.

25       On the deck, it's up to you.  If it's something that's

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    helpful to illustrate what you're saying, I am not saying you

2    can't use it.  I just don't need a -- sometimes they end up

3    being a repetition of the briefs.  So I leave it to you if you

4    think it would be helpful to use that to illustrate while

5    we're talking as opposed to handing it out after the fact.

6          **MR. HOGGE:**  You know what, maybe we can pass out our

7    deck.  We can have it ready because it's unbearably tedious to

8    read in parts of the spec.

9       They've invoked means-plus-function language which

10   requires talking about what's in the spec.  And then reading

11   the spec in the record can be tedious.

12      It can go faster if I could just -- what I've done is

13   taken pains to truncate and try to get at least my side of

14   this case under an hour.

15         **THE COURT:**  Again, that sounds fine.  I mean, I don't

16   think that having a discussion about means plus function

17   necessarily requires reading long pieces of the specification

18   into the record when they're briefed, but again --

19         **MR. HOGGE:**  Okay.

20         **THE COURT:**  -- I leave it to you how you do your

21   presentation.

22         **MR. HOGGE:**  Okay.

23             (Off-the-record discussion.)

24         **MR. HOGGE:**  Go ahead, put it on the screen.

25             (Demonstrative published.).

1    **MR. HOGGE:**  So the starting point really for this

2    discussion I have to say is the *Phillips* case found at 1415

3    F3d. 1303.  And the reason I say that, there's probably 2,000

4    cases that have cited *Phillips* since -- since 2005, but a

5    month ago, I was in Federal Circuit listening to a discussion

6    between Judge Taranto and an appellant, and he said there's

7    really only two standards.

8        There's the BRI at -- PTAB brought us to reasonable

9    instruction, brought us to reasonable interpretation, or

10   there's *Phillips*.  That's all there is.  It's one or the

11   other.

12       And then -- so we're in court, and *Phillips* is the rule.

13   And according to *Phillips*, that standard is basically the

14   words of the patent claim are given their

15   ordinary-and-customary meaning that term would have to a

16   person of ordinary skill in the art in question on the

17   effective filing date of the patent application.

18       And here's -- here's what *Phillips* requires after that

19   person has read the entire patent.

20                    (Demonstrative published.)

21       **MR. HOGGE:**  So then the level of ordinary skill is

22   settled between the parties, and that came out in the IPR both

23   sides submitted to the PTAB, Patent Trial and Appeal Board.

24   We call it PTAB.

25       What that is -- and that's -- comes from page 12 of the

1    final decision on the 850 IPR, paper 41.  And that is a person

2    with a Bachelor's or Master's degree in computer science with

3    two or three years of experience with network computer systems

4    or equivalent experience.  That's a person of ordinary skill

5    in the art.

6        And then I did also want to say that second point or

7    starting point for this discussion is going to be the statute,

8    35 U.S.C. Section 112, paragraph 6, now codified as paragraph

9    F, the means-plus-function statute.  And I think that the case

10   that's most important for us to follow the -- the instruction

11   or the construction language for means plus function is the

12   *Omega Engineering* case, and that's at 334 F.3d 13.

13       And it stands for the proposition that when identifying

14   the claimed function of the claim for means plus function, it

15   is impermissible to limit the function by adopting a function

16   different from what is explicitly recited in the claim.

17               **THE COURT:**  Is that a post-*Williamson* case?

18               **MR. HOGGE:**  No, it is a pre-*Williamson* case.

19       But what this -- and I have -- I'm prepared to discuss

20   *Williamson* right now if you want.  But it is just your basic

21   two-step analysis for the means plus function.

22       This is first a means-plus-function claim limitation

23   invoking the statute, is the syntax there.  Identify the

24   function.  Then go to specification.

25       But it's -- you take the function from the claim.  You

```
 1    don't start adding words to it and -- and doing anything other
 2    than the explicit terms that are in the claim.
 3         Without exception, the defendants here have misidentified
 4    the function in every instance.  They've not taken the claim.
 5    They've taken liberties with that.  And -- And what their
 6    expert did was he had a fanciful identification of what the
 7    function was in the claim, and then he did a word search on
 8    the patent spec and didn't find it.
 9              THE COURT:  So if Omega is the key case, did you cite
10    it in your briefs?
11              MR. HOGGE:  I don't -- I don't know if we did.  We
12    didn't.  But I have the copy of the case if you'd like to see
13    that.
14              THE COURT:  I don't need it.  Thank you.
15              MR. HOGGE:  But it is -- it came -- it became clear
16    to me when they were identifying the function that they were
17    making the function up.  They were adding functions.  They're
18    adding words to the function that were not in the claim.
19         And that's basic -- basically -- and another thing on the
20    word module, which you would -- you were talking about the
21    Williamson case.  They failed to identify "module" for Your
22    Honor as a C++ and Oracle database source code term for
23    subsystems, subroutine.
24              THE COURT:  All right.  Well, what I would say for
25    this sort of granular discussion is if you can tie it to the
```

 1    discussion of one of the claims that's to be construed, I

 2    think that would advance the ball most efficiently.

 3          **MR. HOGGE:**  Okay.

 4          **THE COURT:**  So which -- which term are you starting

 5    with?

 6          **MR. HOGGE:**  I'm going to start with -- I'm going to

 7    take them in order.

 8       If you want to put up pages 2, 3, and 4, Nick, and this --

 9    this will be the order of the discussion.

10                    (Demonstrative published.)

11          **MR. HOGGE:**  "A previous state of said data/copy of a

12    previous state of said data" is the first term up.  And I'm

13    taking that from the Joint Claim Construction Statement.

14       And then if you would put slide 5 up.

15                    (Demonstrative published.)

16          **MR. HOGGE:**  And this is basically the proffered

17    constructions for "a previous state of said data/copy of a

18    previous state of said data," both -- both Synchronoss and

19    Dropbox and Egnyte.

20       Let's go to slide 6, and that's what the --

21                    (Demonstrative published.)

22          **MR. HOGGE:**  Here's what the dispute is, "The meaning

23    of claim term 'state' and the imported functional language."

24       The imported functional language that they want into this

25    claim term is that, quote, that is used in a comparison

 1    against a copy of the current version of the data to generate

 2    difference information.

 3        All right.  So the functional language is actually within

 4    the ambit of the difference transaction generator as that term

 5    was construed by PTAB.  So that would be making two -- almost

 6    two redundant recitations of that construction.

 7        Then I have following in pages 7, 8, 9 examples of where

 8    these terms are used.  In the '757, claims 1, 16 and 24, for

 9    example.

10                    (Demonstrative published.)

11        THE COURT:  Just one question, you made a reference

12    for the construction by PTAB.  I don't see that in your brief

13    either.

14        MR. HOGGE:  Right.

15        Well, I'm trying to state that we did submit during the

16    briefing the PTAB rulings, and while there's not always going

17    to be room in the page extension limits that we have here, I

18    think it -- it's important that as part of the record, PTAB

19    construed "difference transaction generator" to require

20    software that compares a current state of the data to a

21    previous state of the data to generate difference information

22    used in a difference transaction.

23        It is in the agreed constructions.

24        THE COURT:  I don't follow.  What do you mean?

25        MR. HOGGE:  We have a document that has been

1   submitted to Your Honor in the record that's called the

2   "Agreed-Upon Constructions."

3         THE COURT:  Right.  But that's an agreed-upon

4   construction of a different term than the one we're talking

5   about, correct?

6         MR. HOGGE:  Actually, their functional language that

7   they want imported into this limitation is from the

8   agreed-upon construction for "difference transaction

9   generator."

10      So we go to page 10, we have an example from the

11  specification of column 12, lines 12 to 14 --

12                  (Demonstrative published.)

13        MR. HOGGE:  -- of how that term "state" is used in

14  the specification.  Says, "The application object store 920 is

15  a mirrored" surface -- "mirrored interface which stores a

16  snapshot of the previous state of data from the application

17  object 910 in the device engine."  That's just how it's used

18  in the specification.

19      So if we can go to slide 11 --

20                  (Demonstrative published.)

21        MR. HOGGE:  -- our construction of that limitation is

22  proper, Your Honor, because we actually pay attention to the

23  claim term "state" and construe it to mean "information about

24  the data before changes to the data occur."

25        The term "state" means it could be a version number.  It

1    could be something in the header that somehow changes with the

2    data that is compared.  It isn't actually necessarily a

3    comparison or a delta comparison of the entire data set.

4        We don't equate "version" with "state" and neither does

5    the '757 specification.  You can do a word search in the

6    specification, and you're not going to find anywhere in the

7    specification where there's an equation between "version" and

8    "state."

9        A version number can be a state, for example.  But the

10   term is used as a sort of condition.  And then the functional

11   language is not claimed, and it belongs to the difference

12   transaction generator, as I said.

13       Next page is 12.

14                    (Demonstrative published.)

15       **MR. HOGGE:**  Dropbox ignores the claim term "state."

16   They equate "state" with "version."  State -- Saying that '757

17   specification equates those terms.

18       And then, as I said, the difference transaction generator

19   actually is where their -- that language of theirs that they

20   want to import into the claim comes from.

21       That completes my discussion on that first term if you

22   want to --

23             **THE COURT:**  Why don't we hear from defendants.

24                    (Pause in the proceedings.)

25       **MR. HARBER:**  Your Honor, we have slides as well that

1    we'll be using.

2                    (Off-the-record discussion.)

3            **MR. HARBER:**  Do we have need to have it flipped to --

4            **THE CLERK:**  If you give me a minute.

5            **MR. HARBER:**  Oh, sorry.

6                    (Off-the-record discussion.)

7                     (Demonstrative published.)

8            **MR. HARBER:**  Thank you, Your Honor.

9        The I'll go right to the first term that's at issue to

10    sort of address the dispute there.  I understood there to

11    be -- excuse me -- understood there to be one dispute based on

12    sort of the briefing and the meet-and-confer, and then there

13    was another issue raised today, and I'll take those both in

14    turn.

15        The two proposed constructions for the term "a copy of a

16    previous state of data" are -- are displayed on the screen.

17    And in our view and what's been presented in the brief, the

18    key difference between those two constructions are whether or

19    not that concept includes previous information about the data

20    instead of an actual copy of the data itself.

21        And the -- the way this is presented in the claim and the

22    way that it's discussed throughout the patent and the file

23    history makes clear that what's being talked about here when

24    the -- when the claim refers to "a copy of a previous state of

25    data," that it is referring to an actual copy of the previous

1   state of data.

2       It's not referring to a hash value, which is the example

3   that the parties have been -- and use in the brief.  A hash

4   value is not a copy of data.  It is maybe a reference or some

5   information that is generated based on the data, but it is not

6   the data itself.

7       And there's no discussion in the patent of using anything

8   but an actual copy of data in the comparison.

9                   (Demonstrative published.)

10          **MR. HARBER:**  For example, the language that's on the

11  screen, which is cited in our brief, talks about using "the

12  last synchronized version of each application's actual data"

13  for purposes of the next comparison.

14      There is no description that -- Synchronoss has now had 45

15  pages of briefing.  They've presented their argument to this

16  court, and they have been unable to identify any instance

17  in -- anywhere in the intrinsic record where anything but a

18  copy of the data -- an actual copy of the data is used in the

19  comparison.  It's just not described in the patent.

20      And as Your Honor heard last week when Dr. Freedman was

21  explaining the different ways that synchronization can be

22  done, it's -- it's quite a different method of synchronization

23  when you're using these hash values.

24      It's -- that -- that method is not described in the '757

25  patent.  It's not described in the file history.  The -- The

1    only -- The best that the plaintiffs are able to do in an

2    attempt to point to something in the intrinsic record that

3    refers to this concept is a reference in the specification to

4    a "hash."

5        Now, this is the full context of where that reference

6    comes in.  And what it is describing is the --

7                    (Demonstrative published.)

8        **MR. HARBER:**  What it is describing is part of the

9    data store and what are the fields that can be associated with

10   the file on the data store.

11       First of all, in the claim where a previous -- "copy of a

12   previous state of data" appears, it's on the sync engine,

13   which is on the device, not in the data store.  So this

14   reference is irrelevant for that reason.

15       It's also irrelevant because there's no description

16   here -- it merely notes that a hash may be a field that's

17   associated with a file.

18       There's nothing here or elsewhere in the patent that talks

19   about using a hash for -- for a comparison, or the fact that

20   this hash that's being referred to in this context is a --

21   considered "a previous state of said data."  It's just

22   completely irrelevant to the term and the context of the claim

23   we're discussing.

24       The only -- what -- what plaintiffs do, because there is

25   no description in the patent, is that they attempt to use

1    their own internal private post-dated technical documents to

2    say there is some description in those documents of the use of

3    a hash for -- for comparison sake.

4        And, Your Honor, as an initial matter, there is no court

5    in the country that has said it is appropriate to use that

6    kind of evidence in the way that Synchronoss wants to use it

7    in this case.

8        They have not cited a single case that is anywhere close

9    to what they are asking this court to do with that document.

10   This is a document that is not part of the intrinsic record.

11   It is still not part of the public record, meaning no one

12   could go -- no one in the art looking to understand the scope

13   of their claim could go and read that document and understand

14   that's what they were trying to claim here.  And it didn't

15   exist at their asserted priority date.  It post-dates the

16   asserted priority date by more than four years.

17       Even if you brush all of that to the side, which we

18   obviously don't think is appropriate, it -- it does not

19   even -- it does not even answer this question because all it

20   says is in their system -- in the FusionOne system, that

21   there's no attempt to connect it to the claims of the patent

22   at all.  In some cases, a hash value is used.

23       There's no indication that the cases where this is used in

24   their system are the cases that are being claimed in the '757

25   patent years earlier.

1    (Demonstrative published.)

2        **MR. HARBER:**  The other point that I think is

3    important to emphasize to Your Honor is that as -- there's

4    been some reference to the IPR that occurred on -- on this

5    patent on the independent claims that contain the -- this

6    term, the term of "a copy of a previous set of data."

7        Synchronoss was crystal clear in that IPR what they

8    thought this claim required.  And what they thought it

9    required, as we cite in our brief -- it's displayed on the

10   screen -- is it required -- it's required two copies of the

11   actual data, not some representation of the data, not a hash

12   value.

13       They repeatedly make clear, both in the oral argument and

14   in their petition, that what the '757 patent requires and what

15   the -- what the Nichols prior art referenced that was at issue

16   in the IPR was missing was a separate version or state of the

17   data, not just a representation.

18       And it is -- Obviously Your Honor understands it's -- it's

19   the Federal Circuit has emphasized it's completely

20   inappropriate for a party to argue the claims one way for

21   purposes of invalidity and then turn around against accused

22   infringers and say something else.

23       They've taken a position about what these claims mean.

24   It's fully consistent with the intrinsic record in this case

25   about what "a copy of a previous state of said data" means.

1     Briefly on the question of the functional language that's

2   being imported from the difference transaction generator --

3   let me see if I can find this agreed construction.

4     This is the agreed construction --

5           (Demonstrative published.)

6       **MR. HARBER:**  -- of a "difference transaction

7   generator" that's on the screen.

8     And what I understood Mr. Hogge to be saying today was

9   they -- part -- part of what they object to in our

10  construction is the fact that it refers to the copy of

11  previous state of data being the one that's used for purposes

12  of the comparison.  And you'll see that does line up with the

13  agreed construction of "difference transaction generator."

14    The reason, Your Honor, that we believe that language is

15  appropriate is that it emphasizes that the "copy of a previous

16  state of data" that is in the sync engine in the claim is

17  not -- cannot just be -- if a user happens to have an old

18  version of a document sitting around on their computer

19  somewhere, that's not what this is referencing to.

20    What the "copy of a previous state of data" is referring

21  to in the claim is the copy that's used for purposes of this

22  comparison to generate the difference information.

23    So that's all that language is there to make clear.

24    So unless Your Honor has any other questions --

25        **THE COURT:**  I don't about this term.

1        **MR. HARBER:**  All right.  Thank you.

2        **MR. BEARD:**  Hi, Your Honor.

3     I'm not going to talk on every single claim term 'cause we

4  obviously agree with a lot of what Dropbox has said.  The only

5  thing I'd want to emphasis on this claim term is I think it's

6  very dangerous if the court were create a precedent which

7  would allow a company to take a extrinsic document that is

8  secret, that is created four years after the patent was

9  created, and has no connection to the inventors or the patent

10  whatsoever and to be able to expand the claim scope in order

11  to enforce it against competitors.

12     And I think that would create a dangerous precedent for

13  the court.

14     That's all I had, but we agree with everything else that

15  Dropbox said.

16        **THE COURT:**  All right.  What's our next term?

17        **MR. HOGGE:**  Can I address a couple of the arguments,

18  Your Honor?

19        **THE COURT:**  Yes.

20           (Demonstrative published.)

21        **MR. HOGGE:**  Two -- Two points on this.  There is no

22  point to having a versioning module that assigns a version

23  number which is a state of the data unless it's going to be

24  used to look at to determine whether or not there is a -- a

25  necessary difference transaction that needs to occur.  And so

1   you'll see the versioning module, figure 9A, and its

2   versioning module 915.

3       And then I wanted to briefly note how the system works in

4   figure 15.  There is the algorithm and the pseudo-code,

5   really, for the push synchronization, and then -- in the top

6   half is basically logging in, authenticating, looking at the

7   state of the data to determine whether or not it has the same

8   version, and if it's the same version of the data, it returns

9   to an idle state.

10      And that is shown with the acquire MS lock 1425, and then

11  it checks the network, 1430, determines it's the same version,

12  and goes back to the idle state.

13      If it is a new version, then it goes and gets the delta.

14  And that's the comparison there.

15                   (Demonstrative published.)

16          MR. HOGGE:  So it can check the state of the data,

17  which would be a version number, which is what the versioning

18  module is for, and then it can get the delta.

19      And that's all I have to say about that.

20          THE COURT:  All right.  Next term.

21          MR. HOGGE:  The next term two is the management

22  server.

23                   (Demonstrative published.).

24          MR. HOGGE:  And I set that out on slide 13.  And

25  you'll see that our "Management server/management dedicated

```
1    network couple device synchronization agent management server"

2    is the term to be construed.  It's in '757, claims 9 and 21,

3    and it's in '696, claims 5 and 9 through 20.

4         And if we can go to slide 14 --

5                   (Demonstrative published.)

6         MR. HOGGE:  -- our basic dispute with this proffered

7    construction by Dropbox and Egnyte is the term "entire" and

8    "all."

9         The management server is not limited to a centralized

10   server which controls behavior and characteristics of the

11   entire network of device engines across all users.  "Entire"

12   and "all" are imported into this limitation.  They're

13   inconsistent with the claim language itself.

14        If you go to slide 15 --

15                  (Demonstrative published.)

16        MR. HOGGE:  -- I have examples of claims 9 and 21.

17   9, for example, is "The apparatus of claim 8 wherein said

18   management server authorizes access of difference information

19   on the data store by the first and second sync engines."

20        Now, that dependent claim doesn't talk about "all" users

21   and "all" device engines.  It's just first and second sync

22   engines, so that's inconsistent with their construction is.

23        THE COURT:  Well, so their argument is lexicography

24   based on column 32, lines 38 through 40, which is a statement

25   that "the management server is," and then it tracks their
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    proposed construction.

2        Why isn't that direct lexicography given the use of "is"?

3        **MR. HOGGE:**  Well, if you can go to -- Well, the

4    reason is, is that we're describing the preferred embodiment.

5    And you're not supposed to construe the claim and import

6    limitations.  And that is not a situation where it is the

7    lexicography.

8        That -- The "management server" is defined here and after

9    for all reasons that it shall be "entire" and "all."

10        **THE COURT:**  Where -- Where in the specification does

11    it say that this is part of a preferred embodiment?  Or an

12    exemplary an embodiment?

13        **MR. HOGGE:**  Well, I would -- I mean, I would -- I

14    would point you to the -- what I called the detailed

15    description starts on column 5 of the '757, for example --

16                (Demonstrative published.)

17        **MR. HOGGE:**  -- would be the beginning of the

18    description of the preferred embodiments.  That's the -- the

19    section that the manual, patent examining procedure, calls

20    that section.

21        If you look at slide 17 --

22                (Demonstrative published.)

23        **MR. HOGGE:**  -- you see in column 17, lines (sic) 30

24    of the '757 patent, it says, "MS, a management server that

25    manages users' accounts."

 1     And then in column 16, line 50, "MS, a management server
 2  that manages users' accounts."
 3     All they have done is import language elsewhere that's
 4  describing just the embodiment that's in the figures.
 5     And that's, for example -- yes, that's in column 32, lines
 6  38 to 40 --
 7               (Demonstrative published.)
 8     **MR. HOGGE:**  -- where they say, "The management server
 9  is a centralized server that controls behavior and
10  characteristics of the entire network of device engines across
11  all users."
12     It's actually describing a -- figures at that point.  It's
13  actually not defining what that term really means.  And all
14  that term really means is, as we say it is, software, hardware
15  component that manages a user's account.
16     So if we can go to slide 21 --
17               (Demonstrative published.)
18     **MR. HOGGE:**  -- you can -- you'll see that our
19  construction is proper because we actually attempt to construe
20  the claim "management server" rather than to lift a statement
21  out of the specification and assert that that is the
22  definition, a statement that, by the way, as I pointed out, is
23  inconsistent with the claim language.
24     "Entire" and "all" is our -- is our -- is our problem with
25  that claim construction, Your Honor.  We think that's

1    imported.  Otherwise, I don't think there's really problem

2    with their construction.

3        And then if you look at --

4            (Demonstrative published.)

5        MR. HOGGE:  -- claim 9, like we were saying, that

6    it's inconsistent with the -- the claim term, the claims

7    themselves where they're really talking about first and second

8    sync engines and not all device engines in the claims.

9        THE COURT:  What's inconsistent about that?

10        MR. HOGGE:  'Cause the claim -- the claims are really

11    only talking about a first and second sync engine, having a

12    first and second sync engines, not "all" sync engines.

13        Anyway, that's all I had to say about that, Your Honor.

14        THE COURT:  All right.  Dropbox?

15        MR. BAHRI:  Good morning, Your Honor.  Ankit Bahri

16    for Dropbox.

17        As you correctly pointed out, the definition of

18    "management server" that we've proposed is taken directly from

19    the specification.  And --

20            (Demonstrative published.)

21        MR. BAHRI:  -- the language in the specification,

22    again, as you pointed out, uses the words "is a" to clearly

23    indicate that what it's providing is a definition and not

24    just, as Synchronoss's proposed construction attempts to do,

25    just uses one particular function that a management server

1     performs.  Now, in our view, that should basically end the

2     inquiry.

3        And what Synchronoss appears to be doing is its -- it's

4     taking one sentence from the specification, which says one

5     thing that the management server does, and then it's adopting

6     that as a construction.

7        But if you look at other parts of the specification -- and

8     we have them on the screen and we've pointed them out in the

9     brief as well.

10                 (Demonstrative published.)

11        **MR. BAHRI:**  -- there are various other functions that

12     the management server performs, so it doesn't really make a

13     lot of sense to limit the definition of "management server."

14     And we would contend that that's -- their construction is the

15     one that's limiting the definition of "management server" to

16     just one of the various functions that it performs.

17        Here, the case is simple.  The specification defines what

18     a "management server" is, and we don't really see what's

19     inconsistent about a management server that has broad

20     functionality, which is how we propose the construction, that

21     also does the things that's Synchronoss claims that it does.

22        The other thing that Mr. Hogge talked about a lot is that

23     it's inconsistent somehow with claim 1.  But if you look at

24     other claims, they do talk about multiple sync engines.  For

25     example, claim 15 talks about a plurality of sync engines.  So

1    we don't really see how this is inconsistent in any -- in any

2    shape or form.

3        Unless Your Honor has any other questions on this issue --

4            **THE COURT:**  I don't.

5            **MR. HOGGE:**  Term three of ten, if we could have slide

6    23.

7                    (Demonstrative published.)

8            **MR. HOGGE:**  All right.  Here's a situation where we

9    do think -- think there was lexicography going on in the -- in

10   the situation.

11       Claim term -- Disputed claim terms are first, second

12   system, first, second device/devices, network couple devices,

13   network coupled apparatuses.

14       These terms occur in the claim, '757, claims 1, 16, 24;

15   '696, claims 1, 9, 21, 24; '446, claims 1, 3, and 11.  And I

16   have a note to myself to remind the court that the '446

17   specification incorporates the specification of the '757 by

18   reference, so that would expand the specification of '446.

19       And so we have this quote from the specification, and

20   Dropbox has --

21                   (Demonstrative published.)

22           **MR. HOGGE:**  -- listed a list of hardware.

23                   (Demonstrative published.)

24           **MR. HOGGE:**  And if we can go to claim -- or page 24,

25   we think that --

```
 1                      (Demonstrative published.)

 2            MR. HOGGE:  -- the dispute is "system and device are

 3    broad terms."  But more importantly, their definition includes

 4    "software" as being "a device" and in the specification,

 5    "device" is specifically identified as including within its

 6    definition also software.

 7            THE COURT:  So I guess one question I had here for

 8    both parties is, this was one where the --

 9                      (Demonstrative published.)

10            THE COURT:  -- grouping of terms seemed less than

11    self-evident.  We've got "system".  We've got "device."  We've

12    got "network coupled device."  We've got "apparatus."

13    Obviously there is a definition of "device" in the

14    specification, as -- as Synchronoss points out.

15        It wasn't apparent to me on the face of it why that

16    definition of "device," even if accepted, equally applies to

17    "apparatus" or "system."

18        On the one hand, both of the parties seem to think they're

19    groupable, so you don't seem to have a dispute there.  But

20    it -- it wasn't self-evident to me that these are actual

21    groupable terms.

22            MR. HOGGE:  It was a matter of some negotiation, Your

23    Honor.

24        Mr. Jackson, can you answer that question?

25            MR. JACKSON:  Your Honor, the -- the use of the terms
```

 1   in the context of these claims is more of function of the

 2   draftsman art than as a difference in the terms.

 3       So in the context of the terms, for example, the '757,

 4   claim 1, is "A system for synchronizing data between a first

 5   system and a second system."

 6       That could have easily been drafted as "synchronizing data

 7   between a first device and a second device."  So in the

 8   context, these were grouped because this is referencing the --

 9   the devices that are synchronized by the system.

10           **THE COURT:**  Okay.

11           **MR. HOGGE:**  Do you want to --

12           **MR. BAHRI:**  So on that particular issue, Your Honor,

13   it's not -- so Dropbox does not contend that there's no

14   possible construction that covers all of these terms, just the

15   specific construction that Synchronoss has adopted is so

16   inconsistent with the way a person of ordinary skill would

17   understand "system" or "network coupled apparatus" or -- and

18   it is inconsistent with the way these terms are used in the

19   specification, which is what we point out.

20       And so the construction we've proposed is

21   "plain-and-ordinary meaning," which is how a person of

22   ordinary skill would understand these components as having

23   some sort of hardware component, whereas Synchronoss's

24   proposed construction would make a "network coupled device" be

25   just software, which we think is inconsistent with how a

 1    person of ordinary skill would understand that term and how

 2    it's defined in the specification.

 3         **THE COURT:**  But the specification's definition does

 4    include at the end of a long list of possibilities "any

 5    software containing such information residing on a single

 6    collection of hardware."

 7         So it -- What is the dispute?  That you think Synchronoss

 8    is saying that could be completely stand-alone software

 9    detached from hardware?  I don't know how that would make

10    sense.

11         But what -- what -- perhaps I need to understand what the

12    parties are really fighting about in terms of "software" in

13    the context of that definition.

14         **MR. BAHRI:**  Your Honor, the way we understand this

15    dispute to be about is that our view is that the construction

16    of these terms has to include some component of hardware, so

17    there might be cases where a device has hardware and software.

18         But it appears to us that Synchronoss's position seems to

19    be that a device could just be software.  And we think that's

20    inconsistent with how those terms are used in the

21    specification and how that -- how those terms are understood

22    by a person of ordinary skill, as you just pointed out.

23         **THE COURT:**  All right.  But it's "software residing

24    on a single collection of hardware or on different collections

25    of hardware," so it is software associated with hardware, at

```
 1   least in the way that it is described in the specification.

 2       What's wrong that?

 3       MR. BAHRI:  To the extent, Your Honor, that

 4   construction means -- again, we believe that Synchronoss has

 5   advanced the position in its briefing that that language seems

 6   to indicate just software.  To the extent the construction

 7   is -- to the extent the code understands that language to be

 8   software in combination with hardware, we think that's -- we

 9   think that's appropriate as a construction.

10       THE COURT:  And that's what the specification says

11   verbatim.

12       MR. HOGGE:  That's what our proposed construction

13   actually says, "or any software containing such information

14   residing on a single collection of hardware or on different

15   collections of hardware," Your Honor.

16       THE COURT:  Right.  So it sounds like no one's

17   arguing that a device could be software completely detached

18   from hardware, correct?

19       MR. HOGGE:  That's correct, Your Honor.

20       THE COURT:  Is there a dispute here?

21       MR. BAHRI:  I don't think so, Your Honor.

22       THE COURT:  What's our -- what's our next term?

23       MR. HOGGE:  Next term four, "modules."

24       And if you want to -- you want to pull up slide 38,

25   Mr. Jackson.
```

1           (Demonstrative published.)

2           **MR. HOGGE:**  And this is a collection of terms for

3     construction proffered by the defendants user identifier

4     module, authentication module identification a user coupled to

5     the synchronization system user authentication module, user

6     log-in authenticator, user data flow controller.

7         And this is where the defendants have invoked

8     means-plus-function statutory construction under 35 U.S.C.

9     Section 112 paragraph 6.

10        And I did want to talk briefly about the *Williamson*

11    decision, which I read, where -- that was, I think, the right

12    decision in the sense that there was a -- an intent to use

13    "module," hence the term "nonce word means," and it had the

14    proper statutory syntax for performing a function.  In fact,

15    the term module had three functions following it for

16    performing three different functions.  It was easy to identify

17    the functions there.

18        This is not that situation, though.  This is a situation

19    where the term "module" is used in the specification as a term

20    for subroutine subsystem where plug in, and it is C++ source

21    code language.  It is Oracle database source code language.

22          **THE COURT:**  Where is that in the specification, that

23    limitation that you just stated?

24          **MR. HOGGE:**  All right.

25        (Reviewing document.)

1    If we can go to --

2              (Demonstrative published.)

3         **MR. HOGGE:**  -- start slide 44.

4              (Demonstrative published.)

5         **MR. HOGGE:**  Are we there?

6         **UNIDENTIFIED SPEAKER:**  Yep.

7         **MR. HOGGE:**  Column 6 of the '696 patent, this is

8    column 16, lines 37 to 45.  And I've excerpted here this

9    explanation.  "There are a number of related subsystems and

10   documents that the developer must be familiar with, and this

11   document has made many references to those subsystems during

12   the course of presenting the AO," or application object.

13        Jump down three points, "Structured delta" -- that's the

14   code word -- "the delta module differentiation engine that

15   generates differences between application objects."

16        If you do a word search for "module" on the specification,

17   the specification's going to light up in the detailed

18   description.

19        Next paragraph -- next page --

20        **THE COURT:**  But, again, so even if that's a

21   discussion of whatever this delta module differentiation

22   engine is, how does that link to the terms we're talking

23   about, "user identifier module," "authentication module" --

24   what's the basis in the specification for making the

25   connection that you're now trying to draw?

1      **MR. HOGGE:**  Well, I'm getting there, Your Honor.

2      **THE COURT:**  I would get there as quickly as you can.

3      **MR. HOGGE:**  Right.

4      (Demonstrative published.)

5      **MR. HOGGE:**  So one of ordinary skill in the art is

6      going to look at the specification.  He's going to look at the

7      word module and the claim and he's going to know that term

8      "module" is a specific plug-in or subsystem of software.

9      He's going to look at column 17, lines 40 to 60, and

10     that's a C++ example.  And then you're going to see down

11     below, "ModuleIdentity" is the code word for "module."

12     In the specification, next page, column 23, lines 13 to

13     40, you're going to see "ModuleIdentity" is discussed.  And it

14     is how the modules are logged in.  For example, this little

15     description here is, "This is an app object only interface.

16     It provides DLL module identification," and that's dynamically

17     linked library module identification.

18     So these are specific programs, structural programs.

19     I also wanted to --

20     **THE COURT:**  Description of the "user identification

21     module"?

22     **MR. HOGGE:**  Okay.  User --

23     (Reviewing document.)

24     (Demonstrative published.)

25     **MR. HOGGE:**  All right.  So we can skip to page 50.

1          In the specification column 32, lines 14 and 15.  And it

2     is in Fig 17.  As indicated in Fig 17, "The add user module,

3     1712, adds user records to the user in" data "-- device

4     database 1750."

5               **THE COURT:**  But why is that not just a restatement of

6     the function, the add user module adds user records?

7               **MR. HOGGE:**  Because "module" in the specification

8     we're talking software here.  It's not a nonce word.  It's a

9     specific subroutine plug-in subsystem of software.

10         It's not a nonce word.  If it's not a nonce word -- If

11    "module" is not a nonce word in the specification, it's not a

12    nonce word in the claims, Your Honor.

13         I have examples of all these things.

14                    (Demonstrative published.)

15              **MR. HOGGE:**  For example, column 34, lines 1 to 2 and

16    3 to 7, in discussing the software, "the device name and

17    device class uniquely identify a particular device type that

18    is being synchronized...."

19         "Each user has one or more device entries in the

20    management server authorization records and each device name

21    is unique for this user's space.  For example, if the user has

22    five devices with his or her own personal identification

23    number" --

24              **THE COURT:**  So is -- is this anywhere in your brief?

25              **MR. HOGGE:**  Yes.  I -- I believe -- I mean, there's

1    just massive amounts of citations to -- to the record, Your

2    Honor.

3            **THE COURT:**  Okay.

4                    (Simultaneous colloquy.)

5        **MR. HOGGE:**  -- boil it down.

6        **THE COURT:**  Why don't you tell me right now where the

7    arguments that you just made appear in your brief, and I'll go

8    back and I'll review it.

9                    (Pause in the proceedings.)

10       **MR. HOGGE:**  So our reply brief, page 9, we cite --

11                   (Demonstrative published.)

12       **MR. HOGGE:**  -- all of this code, Your Honor.

13   Starting line 8 going over to line 20, we go to -- all the

14   figures, Figures 15, 16, and 17, showing you where these

15   modules are.  User identifier module is in the flow chart in

16   Fig 17.  User log-in from the welcome screen, 1710, Figure 17,

17   and so forth.

18       I mean, it's there in a fairly concise way, Your Honor,

19   identifying where this is in the specification.

20           **THE COURT:**  All right.  And so with regard to Figures

21   15 and 17, what algorithm do you propose that those charts

22   portray that provides structure to these particular group

23   terms related to user identification and authentication?

24           **MR. HOGGE:**  (Reviewing documents.)

25       So the push -- the pull synchronization of Figure 15 has

1    the algorithm -- this is an entire algorithm for push

2    synchronization.  There's authentication module 1420.  There's

3    the acquire MS lock.  There's the checking the state of it

4    there.  A state of the data.  That's the same version.  It

5    goes back to idle.  There's a new version.  Says delta module

6    there.

7           **THE COURT:**  Why isn't this an algorithm, if anything,

8    for the synchronization manager?

9           **MR. HOGGE:**  Well, there -- there's two different --

10   there's pull synchronization that can occur in the system.

11   And there's a push synchronization system that can also alter

12   embodiment, Figure 7 -- 16.  And Figure 17 is an overall

13   algorithm.  It's a graphical representation of this

14   pseudo-code of the system.

15       There's actual source code we've identified in our --

16   our -- our patent, Your Honor, that shows how -- where these

17   modules are, where these plug-ins are, where they occur.  And

18   we've set it out in our brief.

19           **THE COURT:**  All right.  Anything further on this one?

20           **MR. HOGGE:**  Hang on.

21               (Pause in the proceedings.)

22           **MR. HOGGE:**  Yes, there is.

23       If we can go back quickly to slide 38.

24               (Demonstrative published.)

25           **MR. HOGGE:**  Can we go back to slide 38?

1           Do you have it on there?

2                          (Pause in the proceedings.)

3                          (Demonstrative published.)

4                          (Pause in the proceedings.)

5           **UNIDENTIFIED SPEAKER:**  Yep.

6           **MR. HOGGE:**  All right.

7      Your Honor, just a very simple syntax situation here on

8      means plus function.  The -- the function -- to invoke the

9      statute, you have to have means for performing function.  So

10     the "means" word's not there.

11          The "for" performing language syntax is not there.  If

12     you -- If you can see how they've converted "user identifier

13     module" to identifying users -- that's the identified

14     function.  But they've now pluralized the term "user" to

15     "users," "identifying users."  And what we're talking about is

16     a plug-in, a -- a subsystem of software that is for a user

17     identifier.

18          Same with the next claim term "authentication module

19     identifying a user coupled to the synchronization system."

20     Their identification of the function is identifying "and

21     authenticating" a user couple to the synchronization system.

22     But the "and authenticating" is not part of the function if

23     that is a to be a means-plus-function-language.  It has to be

24     "for" -- "for identifying a user coupled to the

25     synchronization system."  So they've imported "authenticating"

1    as a function into that identification function.

2         THE COURT:  So the identification module doesn't

3    provide -- doesn't carry out the function of authenticating?

4         MR. HOGGE:  In the specification -- For the claim,

5    the authentication module only is for identifying a user

6    coupled to the synchronization system.

7         It's actually not for identifying and authenticating.  The

8    authentication module is just for identifying.  That would be

9    the function.  If this were a means-plus-function language.

10    If "module" in this case was not structural.

11         "User authenticator module," they have said that this is

12    authenticating users and that's the function.  That's in the

13    claim.  Now, usually, like in the *Williamson* case, it's very

14    easy to identify the function.  There's three of them that

15    follow the nonce word.  But, again, they're -- the reason why

16    it doesn't work is that they're now pluralizing word "user" to

17    "users."  We get down to user log-in authenticator, user data

18    control controller, and there's -- there's no nonce words

19    there.

20         THE COURT:  Just let me make sure I understand the

21    argument.  What is, in your view, the substantive import of

22    "authenticating users" versus if I said the function is

23    "authenticating a user"?  Do you think that's different?

24         I just don't understand the import that you are placing on

25    this pluralization, and I'm not sure I understand why that

1   makes a substantive difference.

2       **MR. HOGGE:**  Well, ultimately we're -- you're --

3   you're going to issue a claim construction that's going to be

4   the law for this patent, and that's going to be for all users.

5   And that term is -- it's important to not pluralize terms that

6   that are not plural in the claim.

7       It's important -- that -- Now -- and it's very important,

8   especially when you're talking about "a user identifier

9   module," one thing, and suddenly the function is "identifying

10  users."

11      **THE COURT:**  So at least that concern would be

12  alleviated by saying "authenticating a user" if I end up

13  agreeing more with the defendants than I agree with you?

14      **MR. HOGGE:**  Well, you would -- if you want to say

15  that this is a means-plus-function term, then you would say,

16  "identifying a user."  And then you would -- you would go to

17  the specification to find the structure to support that.

18      But the reason -- But if you're going to be fanciful and

19  careless in -- in importing things into that function, that's

20  in the claim that's not there, and then you want to go do a

21  word search on your fanciful representation of what that

22  function is and then come up and say "I can't find it in the

23  spec," that's not how that -- that's not how that works.

24      User -- The last two are -- cannot be means plus function

25  because there's no nonce word there.  There's no module there.

1   There's no means for.  There is just user log-in

2   authenticator.  So if -- is "authenticator" the nonce word?

3   We just don't know, but they -- they've gone from, for

4   example, "user data flow controller" suddenly that is the

5   function in this alleged means-plus-function limitation is

6   "controlling the flow of user date in the synchronization

7   system."

8       None of that -- none of those -- none of that language is

9   claimed whatsoever.  Anyway --

10      So going to page 56 --

11              (Demonstrative published.)

12          MR. HOGGE:  -- of our slide, there's no use of the

13  term "means."  There's no use for the term "for."  The way the

14  word "module" is used in the specification is as a code

15  programming language term.

16      And it's used clearly.  So one of ordinary skill in the

17  art, having read the specification, would then look at the

18  claim and say, "they're using 'module' specifically as a time

19  of plug-in software."  They're not using it as a nonce word, a

20  meaningless thing -- word for "thing."

21      And the proffered -- our proffered construction follows

22  the claim language and its intended meaning.

23      Next page 57.

24              (Demonstrative published.)

25          MR. HOGGE:  They don't -- They don't proffer any

1    construction for the claim limitation.  They're stroking for

2    the fences.  They want the patent invalidated.  They're saying

3    there's no structure for their fanciful phrasing of the

4    functions.

5        They violate the basic tenet in means-plus-function

6    language, which is to adopt a function different from what is

7    explicitly recited in the claim.

8        And then "authenticator" and "controller," those aren't

9    nonce words.  Those don't invoke the means-plus-function

10   statute whatsoever.

11       And that's -- That's all I had to say about that, Your

12   Honor.

13             **THE COURT:**  All right.  Why don't I hear from the

14   defendants.

15                  (Demonstrative published.)

16             **MR. HARBER:**  Your Honor, I can start by saying we did

17   not mean to attach any significance to the singular or plural

18   version of "user," so we are -- if that satisfies Mr. Hogge,

19   we're happy to have that proposed function be "identifying a

20   user" versus "identifying users."

21       But let me -- let me back up a little bit to sort of put

22   this in focus.  The -- The Federal Circuit has been clear,

23   both pre-*Williamson* and post-*Williamson*, that what is not

24   permissible under the patent laws is claiming -- having claims

25   that recite functions and then having the constructions for

1    those be unbounded by any -- any construction in the

2    specification.

3        In other words, having claims that recite functions, and

4    then having those -- those claims cover any way possible to

5    perform those functions.  The Federal Circuit, even before

6    *Williamson*, was clear that that's not appropriate.

7        It could not be clearer that that's exactly what the '696

8    patent is doing.  And this -- essentially what the claims here

9    are is -- you know, some of the claims use "controller," some

10   of them are to "management server," some of them are to

11   "synchronization agent management server."

12       And they have various modules.  Something that identifies

13   a user.  Something that authenticates.  Something that

14   identifies transactions.  Something that controls the flow of

15   user data.  And then on the devices that are attached to

16   those, they have these versioning modules.

17       Now, there's no -- these are -- none of these terms, as

18   Dr. Freeman explains in his declaration, are terms that were

19   known in the art as -- as a term for structure.  These are

20   functions that can be performed many different ways that have

21   profound implications for how a system is designed.

22       And it is not -- what essentially these claims are doing

23   is exactly what the Federal Circuit said you can't do, which

24   is claim a black box.

25       Now, I want to address a couple of the arguments -- the

1    general arguments that -- that I just heard.  One is that

2    "module" -- although courts, including the Federal Circuit,

3    have repeatedly found "module" to be a nonce word, here that's

4    somehow different because it's a C++, you know, subcode.

5       That -- That's really saying the same thing.  The nonce

6    word "module," as the Federal Circuit has explained and as

7    courts applying the Federal Circuit's precedent have

8    explained, is just a word that means "software for doing" --

9    "for performing a function," and that's all Mr. Hogge has said

10    the patent says it's means.  It's just C++ code.

11       He could -- He can't point to any C++ code in the patent

12    or an algorithm in the patent for explaining how any of these

13    functions are performed.  It's -- It's merely saying, "Well,

14    this is C++ code."

15       Notably, this argument, while it doesn't appear in

16    Synchronoss's briefs in this case, was the same argument that

17    the panel opinion in the *Williamson* case used as a basis to

18    find that "distributive learning control module" was not a

19    means-plus-function term.  They looked at a dictionary

20    definition of "module" and said, "that's a physical structure.

21    That's source code for performing some function that's

22    physical so it can't be a means-plus-function term."

23       The en banc Federal Circuit reversed that and said that,

24    "a" module, when it's -- all it is doing is talking about

25    performing a function, that that is -- that that can be

1    subject to means plus function."

2        The other argument that we heard was about the syntax.

3    Does it have to be "a module 'for' performing a function"

4    versus "a function module"?  Your Honor, the implication of

5    Synchronoss's argument in this regard is that if they had

6    drafted the claim so it said "a module for authenticating

7    users," that that would somehow be a means-plus-function term

8    subject to 112(6), but "a user authentication module" would

9    not be.

10        There is no distinction between those terms, and it's the

11    same blind elevation of form over substance that the

12    *Williamson* en banc Federal Circuit rejected in that case.

13        There is no court that we're aware of, and certainly

14    Synchronoss has cited none, that says that that distinction in

15    the drafting in the syntax of the claim makes any kind of

16    difference in the legal analysis when you get to whether the

17    term is covered by 112(6) or not.

18        The -- The -- I think if -- if we step back from the --

19    the arguments that we just heard, frankly, I think the most

20    telling evidence that these are means-plus-function terms that

21    are subject to 112(6) and not the name for structure is to

22    look at the definitions that Synchronoss has provided.

23        Their definition -- proposed construction for "a user

24    identifier module" is "hardware or software that identifies a

25    user," although they say that somehow we've identified the

1    wrong function even though it's essentially the same function

2    they have.

3        They -- They say that "user log-in authenticator" is

4    "software that authenticates a user log-in."

5        All of these are purely functional constructions.  The

6    result of adopting these constructions would be to have a

7    module, a black box, that performs a function, and it would

8    cover any way of performing the function, which is exactly

9    what the Federal Circuit has said you cannot have.

10        The -- When -- When you look at -- So the first grouping

11    of terms as we have them are terms that are related to

12    identifying and authenticating users.  And I would start by,

13    you know, apparently even though, again, there was no dispute

14    in the brief about the function, the functions here are

15    essentially verbatim from the claim language for these terms.

16    And they are verbatim for the functional language that

17    Synchronoss has proposed in its own constructions for these

18    terms.

19        So really, again, we're happy to -- if there's some

20    difference between use and users, we're happy to make that

21    change in the first term, but the functions here I don't think

22    really are --

23                    (Demonstrative published.)

24        **MR. HARBER:**  -- are the point of dispute.

25        So the first question under *Williamson* and what the

 1    Federal Circuit has said the -- the inquiry is, is first, "Are

 2    these terms a name for structure or are they functional

 3    language that's divorced from structure?"

 4        If it's the latter, then you look to the specification --

 5    or you look to the claim in the specification.  You figure out

 6    what the function is, and you figure out if there is

 7    sufficient corresponding structure.

 8        On the first part of this inquiry, "is this a name for

 9    structure?"  It is not.  There is no evidence in this case

10    that these -- that a user identifier module -- that an

11    authenticator module, that any of these terms are a thing that

12    a person of ordinary skill in the art would understand as a

13    definite structure.

14        The uncontroverted expert evidence is that this is a

15    module, software or hardware for performing a function,

16    identifying users, authenticating users.

17        Dr. Freedman explained last week the many different ways

18    that these functions can be performed and the fact that the --

19    the different way -- this is not just some meaningless

20    distinction, that the ways -- the different ways you can do

21    this have profound effects on how you would define your system

22    or on how you would code your system, how you would write this

23    module.

24        And, again, this is precisely what the Federal Circuit in

25    the -- the *Noah* case said.  You cannot have a claim that

1    covers every manner of carrying out of a function.

2        So the -- the question is -- You know, again, the -- the

3    functions line up with the functions in the claim.  The

4    question is, what is -- what is the corresponding structure

5    that's in the specification for -- for these functions?  There

6    is none.

7        I think your Honor was very perceptive when we were seeing

8    parts of the specification put on the board, saying this is

9    the structure for a user authenticator module.  The

10    specification says no such thing.

11        It's a flow chart that talks about push and pull

12    synchronization with one circle that says "authentication."

13    That's not providing an algorithm for how authentication is

14    performed.  It is not a limitation or structure on

15    authentication.  It is merely noting that function was

16    performed.  And that, under the Federal Circuit's law, is

17    plainly improper to be sufficient structure.

18        What the Federal Circuit said in the *Williamson* case in

19    the *Ergo Licensing* case, in the *Aristocrat Technologies* case,

20    all of which are cited in our brief, is that there has to be

21    an algorithm for performing the function.  There is no

22    algorithm for performing the functions of user identification,

23    or authentication in these -- in this specification.

24        The -- The last term was "user data flow controller,"

25    which we've addressed in our brief as a separate term 'cause

1    we think it -- it doesn't really relate to user identification

2    and user authentication, but it suffers from the same issues.

3        Mr. Hogge asked, well, what is the nonce word there?

4    "Controller" is not a nonce word.  And we've cited in our

5    brief cases where courts have found that -- that terms

6    containing the word "controller" are subject to 112(6).

7        It's not -- A "user data flow controller" is not a thing.

8    It's not -- As Dr. Freedman explains in his declaration, it's

9    not a name for structure in the art.  It is a function.  It is

10   a controller that controls the -- the flow of user data.

11       There is no information in the specification -- the

12   word -- the term itself "user data flow control" appears

13   nowhere in the specification.  There is no way to associate

14   any structure with "controlling the flow of user data."

15       Again, on this point, Synchronoss points to general

16   descriptions of push and pull synchronization.  They point to

17   Figures 15 and 16.  And as Your Honor noted before, those

18   figures are about a -- a -- the synchronization generally.

19   There is no information or algorithm within those figures or

20   anywhere else in the patent that talks about what is the

21   algorithm or -- or what is the structure for a user data flow

22   controller.  It's merely a nonsense word that is software that

23   controls the flow of user data.

24           THE COURT:  And so in your view, this bleeds over to

25   the next term, but the fact that Figure 15, in part, may

1  provide sufficient structure for "synchronization manager" is

2  just irrelevant to whether there is sufficient structure

3  stated for these various other terms.

4        **MR. HARBER:**  That's right, Your Honor.  Because

5  there's no equation of -- the patent does not equate the two

6  terms to suggest that they're talking about the same thing.

7  And there's no way to look at that figure and know what is the

8  part of this that is the control of the flow of user data.

9  It's just not -- It would not be apparent by looking at that

10  or anything else in the patent.

11     So I can -- if we want to proceed through the terms,

12  unless Your Honor has other questions about that set of terms?

13        **THE COURT:**  The only question I had -- The only other

14  question I had is, as I read your -- your brief, management --

15  "management server" in your view is a general purpose

16  computer, and that's insufficient to create structure and the

17  cases are clear on that.

18     How does that interact with your construction of

19  "management server" as "a centralized server which controls

20  behavior and characteristics of the entire network of device

21  engines across all users"?

22     In other words, is there any tension in -- in those two

23  positions?

24        **MR. HARBER:**  We don't believe so, Your Honor, and

25  here's why.

1    That -- In the construction of "management server," it's

2    referring to the physical management server which has a

3    definition in the specification.

4    What we object to is using the management server as the

5    structure for other functions.  Right?  So what Synchronoss is

6    trying to do is say, well, the management server identifies

7    users or authenticates users, so therefore that's the

8    structure.  The problem with that is there's no algorithmic

9    information about how the management server is doing that, and

10   so that's the problem.

11   So the problem is not with the construction of a

12   "management server" itself.  It's using the management server

13   without more to be the -- the structure for these other terms.

14          **THE COURT:**  I see.  So the management server is

15   simply a general purpose computer, and you would need, under

16   *Williamson* and these other cases, a substructure in essence

17   for these other terms.

18          **MR. HARBER:**  You would need an algorithm -- Now,

19   there's not a specific type of algorithm you need.  It could

20   be described in language.  It could be source code.  It could

21   be pseudo-code.  It could be flow chart that we've -- we've

22   looked at, but you need some information about how is the

23   authentication being done.

24          **THE COURT:**  All right.

25   Unless you have more, I don't have any other questions

1    about that term.

2              **MR. HARBER:**  Thank you.

3              **MR. HOGGE:**  If I may respond real quickly, Your

4    Honor.  I'm listening here, and we're --

5                   (Demonstrative published.)

6              **MR. HOGGE:**  -- we're confused because it appears to

7    us that they haven't read the specification.

8         The -- the algorithms are in the figures.  The block code,

9    the pseudo-code, and then in the specification, you have

10   actual source code, the source code for doing the management

11   server, the source code for doing the push synchronization,

12   the source code for doing the pull synchronization.

13        And just -- just to sort of cap my -- my comments here, if

14   you look at column 22 on the '757 patent, you can look at line

15   15 where you have computer language for getting unique I.D.

16   and that's the identification structure, software, command.

17   And that's how it's done.

18        One of ordinary skill in the art can use this code and

19   implement push/pull synchronization in a management server

20   with no undue experimentation whatsoever.

21        Next term is term five.  We're almost to the halfway

22   point.  That is the synchronization manager communicating with

23   at least one interactive agent to control data migration

24   between a first network couple device and a second network

25   couple device.  And also synchronization agent.

1          The dispute is -- our interpretation of "the

2     synchronization manager communicating with," that language, is

3     "software or hardware component that manages a user's account

4     and controls data migration."  And in our interpretation,

5     construction -- proposed construction for "synchronization

6     agent" is "software that generates or incorporates the changed

7     transactions."

8          They have, of course, default to 35 U.S.C. Section 112

9     paragraph 6, non-identifying any nonce word, and they go right

10    to, for example, this first limitation, there -- they identify

11    the function as "controlling data migration between a first

12    network couple device and a second network couple device."

13         And they have completely ignored the "communicating with

14    at least one interactive agent to control data migration," so

15    forth.  They've ignored that language.

16         And "synchronization agent," they've said that's a

17    means-plus-function language.  And it's the identified

18    function is "controlling the flow of user data in the

19    synchronization system."

20                   (Demonstrative published.)

21              **MR. HOGGE:**  And none of that language is in the

22    claim.

23         And they -- they point to the structure that supports

24    their means-plus-function interpretation as the entirety of

25    Figures 15 and 16 of the '696 patent and the corresponding

1    text, which is, of course, a push synchronization system and

2    the pull synchronization system together with all the source

3    code, that is set forth in the spec and in the figures.

4        The dispute on page 59 is that it's not

5    means-plus-function language.  There's no syntax here to

6    invoke 35 U.S.C. Section 112 Paragraph 6.

7        We have examples --

8                    (Demonstrative published.)

9        **MR. HOGGE:**  -- of claims.  For example, it is in

10    claim '696, claims 1 and 16.  And in claim 1, for example,

11    page 16 --

12                    (Demonstrative published.)

13        **MR. HOGGE:**  -- you'll see the language is part of the

14    synchronization manager just below the authentication module.

15    And then in claim 16, it's in the -- slide 61.  It's in the

16    preamble, "synchronization agents."

17        So in the specification we have a page that supports our

18    preferred constructions on page 62 --

19                    (Demonstrative published.)

20        **MR. HOGGE:**  -- and it's in lines -- column 13, lines

21    28 to 38, and columns 40 to 43.

22        And it -- for example, there's a long paragraph, but at

23    the end, it says, "access to areas of storage service

24    controlled by a management server described as (sic) fully

25    below."

1    And then below that on page 62 is lines 40 to 43, "log in

2   the management server to authenticate the device and provide

3   the device engine with the location of the individual device's

4   data packages on the data server" -- "on the storage server."

5    Go to slide 63.

6              (Demonstrative published.)

7         **MR. HOGGE:**  We're actually construing the limitation

8   in light of the specification.  We look at the claim language.

9   We look in the specification and then we find out and discern

10  what -- what is the definition of these terms, not how much

11  language we can import from the specification.

12   Again, there's no use of the statutory "means" or "for"

13  syntax.  Nonce words are not used.

14   We think that -- further, that this is a structural

15  limitation, that if you compare the limitation to the abstract

16  statement in '696, it's the same -- pretty much the same

17  definition of "management server."  And I think you caught

18  that.

19   The abstract on '696 says, "The management server

20  communicates with at least one interactive agent to control

21  data migration between a computer to a network storage

22  device."

23   So if "management server" is structural, so would this

24  definition of the "synchronization manager."

25   Now, their arguments name because they don't really offer

```
1    a construction.  The identified function is inconsistent with

2    the claim language.  It's not even supported by the claim

3    language.  And, of course, there's no use of the statutory

4    syntax "means" or "for" or nonce words.

5                    (Demonstrative published.)

6                    (Pause in the proceedings.)

7         MR. HARBER:  So, Your Honor, on these terms, the --

8    the part of the -- seems like the main argument that I heard

9    was that it's -- the syntax is not the same as what should be

10   there for means-plus-function syntax.

11        And, again, the -- the Williamson -- the en banc Federal

12   Circuit was quite clear in Williamson that the inquiry is not

13   supposed to be focused on those sort of form issues, but it

14   should be on the substance, what is being claimed here.

15        And I would submit that with these terms like the ones we

16   just looked at, all you need to do is look at the

17   constructions that Synchronoss is proposing to understand that

18   these are functional, that these are not terms that were used

19   as words for structure.

20        If you look, for example, at "synchronization agent," the

21   construction that they proposed is "software that generates or

22   incorporates the changed transactions."  It doesn't say how.

23   It doesn't say where.  It provides no information about the

24   structure of how that's done.  It is simply general hardware

25   or software for performing a function, which is precisely what
```

1    renders something subject to 112(6).

2        The other arguments we heard was equating a

3    synchronization manager to the management server.  These

4    words -- there's -- there's nothing in the specification, the

5    prosecution history, the claims that equates these two terms.

6    They're used separately.  The claims use both terms.

7        Claim 9 uses the term "management server."  Claim 1 uses

8    the term "synchronization manager."  There's no indication

9    that those are referring to the same thing.

10        The -- In terms of the corresponding structure for these,

11    we have pointed to Figures 15 and 16 and the corresponding

12    text, which provides an explanation of what's happening in --

13    in those figures and provides some pseudo-code.

14        And what those parts of the specification do is provide

15    what we think can adequately be considered an algorithm for

16    what is -- how does the purported invention synchronize --

17    control the migration of data between these devices.  It does

18    so by the steps that are identified in those figures and

19    explained in the corresponding text.

20        I -- Other than pointing to a management server and saying

21    that "synchronization manager" should be defined as the

22    "management server," Synchronoss doesn't really point to a

23    different part of the specification that explains how these

24    functions are done.

25        This is -- This is where it's explained.  And without the

1   structure that is provided by these parts of the

2   specification, again, all we're looking at here is purely

3   functional -- a component of a system that carries out a

4   function.  There's no structure.  There's no limitation on --

5   on how it's done otherwise, which is improper under 112(6).

6           **THE COURT:**  All right.  Thank you.

7               (Demonstrative published.)

8           **MR. HOGGE:**  My comment there is that he took a look

9   at our construction and then he started to construe our

10  construction under paragraph 6, 112, and that was sort of one

11  off from the limitations, "synchronization agent," and got far

12  afield so I'm construing the actual term.

13      We're now at term six.  This is halfway -- more than

14  halfway.

15          **THE COURT:**  I think this would be the time to take

16  our break.  So let's -- it's 11:25.  Let's come back at 11:30.

17          **MR. HOGGE:**  Thank you, Your Honor.

18      (Recess taken at 11:26 A.M.; proceedings resumed at 11:35

19  A.M.)

20          **THE CLERK:**  Remain seated come to order.  This court

21  is back in session.

22      All right.  On to "versioning."

23          **MR. HOGGE:**  Yes, Your Honor.

24      Term six, "versioning modules" and "versioning

25  information."

1          If we go slide 65 up there?  And --

2                    (Demonstrative published.)

3          **MR. HOGGE:**  And then so slide 65 shows "versioning

4  modules."  Our construction is "software that applies

5  versioning information to objects in a changed transaction."

6          And they, of course, say that this is means-plus-function

7  language.  Not finding any nonce words, not finding any means

8  or -- for syntax.

9          And then they have a paragraph shown on page 65, and it's

10  the same paragraph that they -- I think it's the same

11  paragraph they use for "versioning information."  I just --

12  The only thing I wanted to say is that the top half of that

13  paragraph that's entitled "structure" down to "version number"

14  has to do with identify -- identifying a -- a -- a version, if

15  you will.  And the only thing that has anything to do with

16  versioning in that paragraph is the version number is one form

17  of D001, so forth.

18          And then the next page, 66 --

19                    (Demonstrative published.)

20          **MR. HOGGE:**  -- is "versioning information."  We say

21  that that term should be construed as "information about

22  modifications to data."  And they say, it should be the same

23  thing, same definition as "versioning modules."

24          Next page 67 is how we view the dispute.

25                    (Demonstrative published.)

 1          MR. HOGGE:  "The claim limitation is not limited to

 2   applying specific rules of UUID.VER where UUID identifies the

 3   object and VER is the transaction version number."  That's not

 4   claimed in the claim.

 5      Examples of versioning -- examples in the claims are shown

 6   in pages 68, 69, and 70 --

 7                    (Demonstrative published.)

 8          MR. HOGGE:  -- 71.

 9                    (Demonstrative published.)

10          MR. HOGGE:  And that's claims 1, 9, 16, 24 of --

11                    (Demonstrative published.)

12          MR. HOGGE:  -- the '696 patents (sic).  And you can

13   see that, for example, claim 1, last clause, the current table

14   clause, I will call it, is "the versioning information

15   generated by versioning modules."  Those are separate things.

16   They're not the same things.

17          THE COURT:  Well, then why did we group them?  I

18   mean, if they have separate meanings, then why do we not have

19   11 terms rather than 10, and no one asked to construe 11?

20          MR. HOGGE:  Right.

21      It's -- we've only thought three of these terms needed

22   construction.  That's not a question I can answer, Your Honor.

23   We didn't -- we didn't ask that this be construed.

24      Maybe that -- the defendants can respond to that.

25      The -- If you look at page 72, we have a callout on Figure

 1    9A, which is the Desktop Device Engine, Figure 9A.  And then

 2    we highlighted the versioning module, which is 915, I think.

 3    And then we have some --

 4                    (Demonstrative published.)

 5         MR. HOGGE:  -- specific code language on slide 73,

 6    for example, in column 34 --

 7                    (Demonstrative published.)

 8         MR. HOGGE:  -- line 54 to 60.  This is --

 9         THE COURT:  So Figure 9A is called "Desktop Device

10    Engine."  Correct?

11         MR. HOGGE:  Yes, Your Honor.

12         THE COURT:  And what --

13                    (Demonstrative published.)

14         THE COURT:  -- about 9A applies to "versioning

15    module" or "versioning information"?

16         MR. HOGGE:  It's the block on the left side that I've

17    highlighted called "Versioning 915."  That's the versioning

18    module.  91A --

19                    (Demonstrative published.)

20         MR. HOGGE:  -- and that -- that applies to the

21    "versioning information," if you will.

22         And I've got other parts of the specification, for

23    example, slide -- as I was saying, slide 73, some code

24    language.  And you'll -- you'll see there's "download remote

25    version" as a command.  And then "increment local version,"

1    and that means to add another number to it, the next number.

2        And then slide 74 --

3                (Demonstrative published.)

4            **MR. HOGGE:**  -- is a callout.

5            **THE COURT:**  What is -- I just want to be sure I

6    understand your argument.  What's the significance of that

7    "increment local version" for the point at issue here?

8            **MR. HOGGE:**  It's versioning module.  It applies

9    versioning information to objects in a change transaction.

10   And the "versioning information" would be the "increment local

11   version."  And the increment is to apply the next number for

12   the local version.  That's -- That's the code language.

13       The callout on page 74, column 35, line 7 --

14               (Demonstrative published.)

15           **MR. HOGGE:**  -- is just -- shows that it's -- update

16   the local version number, what I was just talking about.

17       In the header package in the change information or

18   difference information that's shown in page 75, column 40,

19   line 63, you'll have a header.  In the header of the package's

20   I.D., datapack I.D. plus datapack version.

21               (Demonstrative published.)

22           **MR. HOGGE:**  And then next page, 76, in the

23   specification, discussion is "Device engine 860 further

24   includes a versioning module which applies a version number

25   per object in the data package."

1    The next page 77 is a discussion about the versioning

2   module 915 and how it works.

3                    (Demonstrative published.)

4        MR. HOGGE:   That's in the Figure 9A, and that's the

5   discussion about Figure 9A.

6        And then in slide 78 --

7                    (Demonstrative published.)

8        MR. HOGGE:   -- we have a callout for column 38, line

9   67 where it says, "The data package header information will

10  include version signature, applied versioning information."

11       So those are the ways the specification uses the term

12  "versioning modules," "versioning information," and so we

13  believe one of ordinary skill in the art would interpret them

14  as the way we've suggested.

15       Our -- As we show in slide 79, we believe our

16  construction's proper because we construe the term in light of

17  the specification.  We construe the term not as a

18  means-plus-function language.

19                    (Demonstrative published.)

20       MR. HOGGE:   Their arguments fail --

21                    (Demonstrative published.)

22       MR. HOGGE:   -- because they're -- "versioning

23  modules" is not a means-plus-function term for all the reasons

24  we've stated before.  No "means," and no "for," and no nonce

25  words.  It's a structure.

1           Two, just assuming arguendo it is means plus function, the

2     function must be versioning and not applying a version number

3     per object in the data package.  It's not -- Their

4     identification of the function doesn't come from the claim

5     language.  It comes from something that they just make up as

6     they go along.

7           **THE COURT:**  But what is "versioning"?  I understand

8     that's the term in the claim, but what is -- what is that?

9           **MR. HOGGE:**  It's -- It's applying a version number.

10          **THE COURT:**  All right.  So why wouldn't the function

11    be "applying a version number"?  I mean, it doesn't -- don't

12    we have to give some substance to the term in the claim?

13          **MR. HOGGE:**  Yeah, it would.

14                     (Demonstrative published.)

15          **MR. HOGGE:**  But "per object in the data package,"

16    that's not claimed.  That would be my dispute with that

17    identification of a function.  It's just "applying a version

18    number," period, is "versioning."  Not "per object in the data

19    package."  That's not claimed.

20          **THE COURT:**  All right.

21          **MR. HOGGE:**  And that's all I have to say about term

22    No. 6, Your Honor.

23          **THE COURT:**  All right.  Defendants?

24          Maybe you can start with that point that we were just

25    discussing.  Where is the support for "per object in the data

1 package"?

2       **MR. HARBER:**  In the specification, Your Honor, in the

3 language we cite.  And I believe --

4       (Demonstrative published.)

5       **MR. HARBER:**  -- that this is the one term that we're

6 dealing with on the -- in the means-plus-function group where

7 there is -- the word -- the term "versioning module" actually

8 appears in the specification, and it appears in the

9 specification with a specific description of what it does.

10       (Demonstrative published.)

11       **MR. HARBER:**  The -- Mr. Hogge pointed to this

12 language, the highlighted sentence at the top that talks about

13 the device engine including "a versioning module which applies

14 a version number per object in the data package."  Again,

15 that's the language that we just talked about for the -- for

16 the function.

17     The next sentence which they don't focus on in the brief

18 and which wasn't the focus of the argument was, "as explained

19 further below, each object in the data package is assigned a

20 universally unique ID."

21     When you follow the patent down further, the very language

22 that we're using as the structure is what appears.  This is

23 how the specification defines what the versioning module is

24 and what it does.  It uses a specific -- uses specific rules,

25 the underlying language here.  That's what the patent is

1    saying the versioning module does.

2         Now, none of the -- we saw some other parts of the

3    specification.  Increment version number.  We saw some

4    pseudo-code that talked about how the header was defined.

5    None of that's inconsistent with this.  None of that adds

6    anything to this or says that versioning is performed a

7    different way in the specification.

8         This talks about how you increment the version number, and

9    that pseudo- -- all that pseudo-code does is say, you

10   increment it.  You increment D001 to D002 in this structure.

11        Now, the -- this is not -- again, as we explain in our

12   brief, to -- whether you're in the -- the preliminary question

13   of whether you're in 112(6) world or not, you are clearly in

14   112(6) world here again.  "Module" is the nonce word.

15   "Versioning" is a function.  It is something you do.  It is

16   not -- it doesn't give content to how you do it.

17        And -- And so when you look at the specification -- again,

18   this is, I believe, the -- the one instance where the

19   specification does describe -- does describe a "versioning

20   module."  It gives it specific structure, an algorithm for how

21   that versioning is performed.  And that is all that we're

22   asking for the construction to be here.

23        Now, in terms of the question of whether "versioning

24   modules" and "versioning information" are sort of unrelated

25   terms that should have different meaning, the -- the claim

1    language that was up on the board from claim 1 is that

2    "versioning information" -- refers to "versioning information

3    generated by the versioning module."  They're not some

4    distinct concepts.

5        It is -- What the versioning information is, is what the

6    versioning module generates.  And what the versioning module

7    generates is described in the specification in the language

8    we've quoted.  So it is logical that the versioning

9    information that is the output of that process is that

10   versioning information.

11       Unless Your Honor has further questions --

12           **THE COURT:**  The only question I had is what do you

13   make of the -- the plaintiff's citation to column 40 starting

14   at line 55 where it says, "The data package transaction format

15   may take a number of forms"?

16       What, if anything, does that mean for your proposed

17   construction?

18           **MR. HARBER:**  The -- This is talking about the data

19   package transaction.  It's not talking about the versioning

20   module part of it, so obviously the data package transaction

21   can take a number of forms.  But there's nothing in here that

22   says that the versioning information that is provided by the

23   versioning module as part of that data transaction takes a

24   different form.

25       There's only one form and one structure that's described

1    in the specification for providing that information.

2         **THE COURT:**  Your proposed construction of "versioning

3    information," for example, is "a unique version number applied

4    per object in the data package using specific rules," and

5    those are the rules that you described in the specification.

6      But how, then, might there be other forms for a data

7    package transaction?

8         **MR. HARBER:**  So the -- my understanding is that there

9    is a -- there are data package transactions, and within the

10   data package transaction, there is versioning information.

11     So if you look at the pseudo-code that's in -- in column

12   40, what's being referred to is the data package transaction.

13   And within that pseudo-code, it has "Header is I.D. plus

14   datapack I.D. plus datapack version."

15     The -- The issue for the term "versioning module" and

16   "versioning information" is how do you define that data.  It's

17   not -- it doesn't speak to what is the transaction format of

18   the rest of the data package transaction, which the

19   specification is saying can be in different forms.

20     It's a component of -- That's speaking to the larger

21   object, a component of which is the versioning information.

22   And that versioning information, there's only one form that's

23   described for providing that.

24         **THE COURT:**  All right.  So your view is that

25   "versioning information" is a subpart of data package

1  transaction?

2          **MR. HARBER:**  It is a part -- yes, it is a part of the

3  data package transaction.  It is -- It is a version number

4  that's assigned to those transactions.

5          **THE COURT:**  All right.

6      I don't have any other -- other questions about that.

7          **MR. HARBER:**  All right.  Thank you.

8          **MR. HOGGE:**  Again, I just wanted to close with the

9  first part of their --

10                  (Demonstrative published.)

11          **MR. HOGGE:**  -- identification of the structure has to

12  do with identifying the pack and not applying a version

13  number.  Doesn't have anything to do with versioning.

14      Claim -- The next term seven, "transaction identifier

15  module."  That's in claim -- '696, claims 1, 9, 16, 24.  We

16  say that that means "a software for identifying a

17  transaction."

18      And their -- their position is, of course, this is

19  means-plus-function language, and the function is identifying

20  transactions in the synchronization system and that there is

21  no structure identified in the specification.

22      I think the dispute is that it's not a means-plus-function

23  limitation.  We have examples in slides 8 and -- in slide 83

24  of how the transaction identifier module occurs, for example,

25  in claim 9.

1          (Demonstrative published.)

2          **MR. HOGGE:**  Next slide --

3          (Demonstrative published.)

4          **MR. HOGGE:**  -- 84, is a callout in column 37, line 62

5     to 63, "A datapack essentially contains a sequence of

6     transactions describing changes to information."  That

7     supports our construction that's software for identifying a

8     transaction.

9          In next slide 85, column 38, lines 48 to 51 in the '696

10    patent is specifically --

11          (Demonstrative published.)

12          **MR. HOGGE:**  -- talking about an embodiment.  "A

13    datapack file is identified using specific rules based on the

14    file name.  The file name is of the form UUID.VER where UUID

15    is the identifier for the specific object and VER is the

16    transaction version identifier."

17          All right.  So our position is that we're construing the

18    language in the claim as one of ordinary skill in the art

19    would.  He's read the specification.  He's looking at the

20    claim language.  And he's like, this is what this term means

21    to me.  And this is how they were using the term.

22          (Demonstrative published.)

23          **MR. HOGGE:**  On page 87, our -- we believe their

24    arguments fail because it's not statutory means-plus-function

25    language.  Doesn't invoke the statute.

 1        They fail to identify the function in the claim.  If

 2   "module" is equivalent to "means," then the function is the

 3   remaining words in the limitation, transaction identifier

 4   which could be identifying a transaction, but not the

 5   additional "identifying transactions in the synchronization

 6   system," "in the synchronization system," it's not part of the

 7   claim.  It's not claimed.  Doesn't fit there.

 8        And that's basically what I have to say about that, Your

 9   Honor.

10        **THE COURT:**  All right.  And the only question for the

11   parties on this one is, unless I missed something in the

12   Amended Joint Claim Construction Statement, we had the term

13   "transaction identifier module assigning a universally unique

14   modifier," et cetera.  But I don't -- that one didn't seem to

15   be briefed in quite that phrasing.

16        Am I right about that?

17        I think the briefs were just "transaction identifier

18   module."

19        **MR. HOGGE:**  The next term would be "universally

20   unique identifier" that would be term eight in my -- in my

21   sequence, Your Honor.

22        **THE COURT:**  Well, I did see that, but is there -- I

23   just want to be clear, do -- does seven involve two terms:

24   One, "transaction identifier module," and "transaction

25   identifier module assigning a universally unique identifier,"

1    et cetera?

2         **MR. HOGGE:** I don't -- I don't believe so, Your

3    Honor.

4         **THE COURT:** All right. So seven is just "transaction

5    identifier module," correct?

6         **MR. HARBER:** That's correct.

7         **THE COURT:** All right. And then eight will be

8    "universally unique identifier."

9       Correct?

10        **MR. HOGGE:** That's correct, Your Honor.

11        **THE COURT:** All right. 'Cause the additional part is

12   "The universally unique identifier to each user of transaction

13   objects in said data store." I think that's what the claim

14   construction statement says.

15      Are the parties seeking a construction of that entire

16   phrase? Or is it just "transaction identifier module" and

17   then "universally unique identifier"?

18        **MR. HARBER:** I think it is -- is the latter. And the

19   reason is the "transaction identifier module" is used in other

20   claims where it does not -- it has different language that

21   follows it, that talks about what it's doing.

22        **THE COURT:** Okay.

23        **MR. HARBER:** So --

24        **THE COURT:** I don't need to construe that entire

25   phrase starting with "transaction identifier" and ending with

1   "said data store."  Parties agree?

2            **MR. HARBER:**  We agree, Your Honor.

3            **MR. HOGGE:**  Yes, Your Honor.  That's their disputed

4   term.

5            **THE COURT:**  All right.

6            **MR. HARBER:**  So, Your Honor --

7                   (Demonstrative published.)

8            **MR. HARBER:**  -- again, I think, you know, the first

9   question here when it comes to looking at are we talking about

10  a term that's subject to 112(6) is, is this functional or is

11  it a name for structure.

12       And, again, I think the best starting point is with the

13  construction Synchronoss itself has proposed here, which is

14  just "software for identifying a transaction."  That's purely

15  functional.

16       There -- As Dr. Freedman explains in his declaration and

17  as he explained last week, there are many different ways to do

18  this.  Many different structures for a module that would

19  identify transactions.  This is not a -- a name for structure.

20       Now, there is -- when you turn to the specification to

21  figure out what is the structure, if any, that corresponds

22  with this function, there isn't any.

23       There -- There is -- The structure that -- the Synchronoss

24  points to is structure around the datapack files.  And they

25  basically say that the disclosures in the specification for

1    numbering the versions of the datapack file is the same thing

2    as the transaction identifier module.  That's what's done by

3    the transaction identifier module.

4         That's incorrect, Your Honor.

5                    (Demonstrative published.)

6         **MR. HARBER:**  If you look at what the specification

7    says, and we have some of the key language up on the screen, a

8    datapack file is not a transaction.  A datapack file contains

9    a sequence of transactions.

10        What Synchronoss is doing is taking the language -- and it

11   contain -- can contain other things, what the second box

12   shows, besides transactions.

13        What Synchronoss is doing is taking the language in the

14   bottom box, which they still describe as just one embodiment,

15   and that language talks about how do you do version numbers,

16   as we just looked at, for the datapack files, and is saying

17   that that is the structure for a transaction identifier.

18        It's not.  It's the structure for how you assign version

19   numbers to versions in the datapack files.  It's not -- It

20   doesn't have anything to do with the individual transactions

21   within the datapack files.

22        I think that's an important distinction, that -- There's

23   simply not structure in the specification for how you identify

24   these transactions.

25        In terms of the -- one of the other disputes that -- that

 1   I heard from Synchronoss that, again, we didn't see in the

 2   brief was whether the language "in the synchronization system"

 3   should be part of the claimed function.

 4       Again, I think from our perspective, that -- we think

 5   that -- that's correct, and there's no reason why that's an

 6   inaccurate description of the function.

 7       I think -- it's -- We don't mean to have there be some

 8   distinction between "identifying transactions" and

 9   "identifying transactions in the synchronization system."

10   That's what we're talking about here, so in our view they're

11   sort of one in the same.

12       THE COURT:  All right.  So, again, it could be

13   identifying a transaction in your view, and it wouldn't change

14   the substance of your argument.

15       MR. HARBER:  Yes.  I think the implication is that

16   it's identifying a transaction in the claimed synchronization

17   system.  But we don't -- We don't see a distinction or any

18   significance in those last few words.

19       THE COURT:  All right.

20       MR. HARBER:  That's all I have unless Your Honor has

21   other questions on that term.

22       THE COURT:  I did not.

23       MR. HARBER:  Thank you.

24       MR. HOGGE:  Thank you, Your Honor.

25             (Demonstrative published.)

```
 1              MR. HOGGE:  Again, they -- they want to construe my
 2    construction as a means plus function instead of just the
 3    claim term itself as means plus function.  They -- I think I
 4    heard them say that software is not structural.  It is
 5    structural.  It is structural as a matter of law.
 6              THE COURT:  Okay.  I get your argument on the means
 7    plus function.  It's been pretty much the same one throughout,
 8    but --
 9              MR. HOGGE:  It is.
10                      (Simultaneous colloquy.)
11              THE COURT:   -- we've run that course.
12              MR. HOGGE:  Okay.
13        "Universally unique identifier" is term eight.  We say
14    that it is a term of art and that the specifications (sic)
15    uses that as "a unique 128-bit value which may be assigned by
16    the system provider."
17        And their construction is "a 128-bit value," but then they
18    go on with "the consisting of 16 octets that guarantees
19    uniqueness across space and time as standardized by the Open
20    Software Foundation."  The basis for that is not the
21    specification but their expert declaration.
22                      (Demonstrative published.)
23              MR. HOGGE:  And it's simply not in the specification.
24    It's not in the claim.  And under Phillips, that is not
25    helpful from an expert.
```

```
 1        So the dispute on page 89 is that they've imported from
 2    the expert declaration that language.  "Sixteen octets...
 3    guarantees...standardized."
 4                  (Demonstrative published.)
 5        MR. HOGGE:  It's -- claim term is used in claim (sic)
 6    90, is shown in the current table clause of claim 1 in the '69
 7    (sic) patent.
 8        The specification supports our definition of "UUID" in
 9    column 38, lines 34 to 35.  It's shown in slide 91.  "Each
10    UUID has a unique 128-bit value, which maybe assigned by the
11    system provider."
12        Next slide, our construction's proper, is supported by the
13    specification.
14        And their argument must fall because there's no basis in
15    the specification/intrinsic evidence for that construction.
16    And that's all I have for term seven.
17            THE COURT:  All right.
18            MR. HOGGE:  Or term eight, I mean.
19            THE COURT:  All right.  Defendants?
20        MR. BAHRI:  Your Honor, last week, if you recall,
21    Dr. Freedman described a particular term of art, a UUID as a
22    term of art that refers to a specific type of identifier that
23    is -- that is generated in a particular manner to guarantee
24    universal uniqueness.
25        Now, the dispute between the parties is whether the way
```

1    the patent refers to the term UUID, whether it's referring to

2    that particular term of art, or whether, as Synchronoss

3    claims, it's referring to any 128-bit unique identifier.

4        And if you just look at the way the specification talks

5    about UUID --

6                    (Demonstrative published.)

7        **MR. BAHRI:**  -- it makes clear that what it's doing is

8    referring to that particular term of art.  Because as we've

9    put -- as we point out in our brief, and it's on the slide

10   right now, it repeatedly refers to "a UUID standard."  It

11   doesn't just say "a UUID."  It always refers to a UUID

12   standard.

13       And not only that, every time it refers to a unique -- a

14   universal (sic) unique identifier, it puts the acronym "UUID"

15   in parenthesis, which indicates that it's referring to that

16   particular standard that Dr. Freedman talked about last week.

17       And Synchronoss has had no explanation for why the

18   specification would talk about a "UUID standard" if it wasn't

19   referring to a particular term of art.

20       **THE COURT:**  Well, but they did point to examples of

21   non-Open Software Foundation UUID's, correct?

22       What -- It seems to me that I would have to read a lot in

23   to import your definition of "standard" into the construction

24   of the term.

25       **MR. BAHRI:**  Your Honor, but Dropbox's construction,

1    even though we talk about it being standardized by the Open

2    Software Foundation, it does encompass these different

3    versions and variance of UUID's.

4        The documents that they point to talk about different

5    versions of UUID's, but irrespective of different versions,

6    the basic shared characteristics, which are the

7    characteristics that we -- we talk about in our construction,

8    are the same across these different versions, that they --

9    that each UUID must have 128 bits, each U must have 16 octets,

10   and most importantly, it must guarantee universal uniqueness

11   across space and time.

12       Synchronoss's construction completely reads out the word

13   "universal" out of the claim term itself, because there's no

14   explanation for why a 128-bit identifier and a 128-bit

15   identifier would just be a collection of numbers and letters.

16       There's no explanation for how that identifier generated

17   within the system would be unique across systems or would be

18   unique many -- at some point in time in the future.  And so

19   it's completely reading out the word "universally" out of the

20   system.

21       And so even though it was standardized by the Open

22   Software Foundation, the fact that there have been different

23   versions in variance, which is what the document that they

24   cite to talks about, does not change that basic tenent --

25   tenet of a UUID, which is that it guarantees universal

```
 1    uniqueness and that it is --

 2                     (Demonstrative published.)

 3          MR. BAHRI:  -- always in this particular format that

 4    Dr. Freedman talked about.

 5       So there are different ways of generating it, but it's

 6    still a UUID.

 7       If Your Honor has no more questions --

 8          THE COURT:  I don't.  Thanks.

 9          MR. HOGGE:  Claim number -- term number nine --

10                     (Demonstrative published.)

11          MR. HOGGE:  -- is "digital media file."  Both

12    parties -- This is page 94 -- Losing my voice.

13       In our slide deck, we show that our -- our construction is

14    "Plain, ordinary meaning - a file comprising digital media

15    content."  And we don't think that the jury needs to be

16    instructed any further than that.

17       Dropbox and Egnyte say it's plain and ordinary meaning,

18    but it's "Digital audio or video content in the form of an

19    individual file such as MPEG, MP3, RealAudio, or Liquid Audio

20    file."

21       And --

22                     (Demonstrative published.)

23          MR. HOGGE:  -- so our dispute, on page 95, is that

24    the claim is not limited to types of digital media.  It's not

25    actually limited to a single file of a particular format.
```

1    They are trying to limit the transmission of files having

2    specific format in that claim.  This term, "digital media

3    file," is in claim 1 of the '446 patent, shown on page 96,

4    appears several places.

5                    (Demonstrative published.)

6         MR. HOGGE:  It has in -- In step C, where we're

7    talking about generating a digital media file, in the middle

8    of the claim is "in the same format," so the claim isn't --

9    doesn't specify a type of format, recognize could be different

10   formats, but when we're talking about formats, we're talking

11   about whatever it is, it's going to be the same format when

12   it's being operated on, according to this method.  And that's

13   claim 1.

14        Next page 97 --

15                    (Demonstrative published.)

16        MR. HOGGE:  -- sets forth claim 11 where these terms

17   appear.

18        We have some specification of the '446 patent shown on

19   page 98, column 5, lines 11 and 26.

20                    (Demonstrative published.)

21        MR. HOGGE:  And just shows how the -- the

22   specification uses the term "digital" --

23        Hang on for a second.

24        THE COURT:  Right, but I just thought the way that

25   that was referenced in your brief was inaccurate.  I mean,

```
 1    right after -- I guess we're seeing on the screen, it says,
 2    "The MP3 will also contain binary information," which seems to
 3    me -- or and the MP3 file may contain text information
 4    identifying the artist and title of the work.
 5        In other words, there may be text associated with an MP3
 6    file, but I think the way that it was characterized in your
 7    brief is that media -- digital media could include text and
 8    graphics.  And I just don't think that's consistent with what
 9    this specification says.
10        We might have to figure out how to define "digital media,"
11    but it does seem to be talking about audio and video in the
12    way that it's described consistently throughout the
13    specification.
14            MR. HOGGE:  Right.  Well, and the embodiments and the
15    detailed spec, I think that's a fair statement.  But it is a
16    media file in the claim.  It's not specific to examples.
17        And we've set forth in our brief that it is improper to --
18    for example, to instruct the jury with examples of what these
19    terms are.
20        I mean, for -- you know, saying things, like "such as
21    MPEG, MP3," 'cause there's a whole list of things that that
22    digital media file could be.
23        On page 99 --
24                (Demonstrative published.)
25            MR. HOGGE:  -- we show that we're -- our use of the
```

1    term, our construction, is -- is consistent with this -- with

2    the specification.

3        THE COURT:  Here, I was surprised.  Usually for a

4    term like this, the parties show up with some sort of -- I

5    mean, if we're talking about a plain-and-ordinary meaning

6    construction, there's some extrinsic evidence that is

7    presented to show what a one of ordinary skill in the art

8    would view as the plain-and-ordinary meaning.

9        I don't think either party really did that, which made

10   this one less than helpful in terms of what you're presenting.

11       But I think looking at the specification as a whole, I --

12   I don't think it would be appropriate, for example, to say

13   that Microsoft Word documents are digital media based upon on

14   the context of the specification and the described purpose of

15   the invention here.

16       So what I'm trying to get is, as a practical matter, it

17   doesn't appear to me that you're providing any limitation on

18   what a digital media file is given the structure and content

19   of the specification, or providing some common understanding

20   of those of ordinary skill in the art.

21       It's just this seemed like a -- an odd set of proposed

22   constructions on both sides.

23       MR. HOGGE:  Did you have a proposed construction in

24   mind, Your Honor?

25       THE COURT:  I don't -- Well, I was thinking.  I mean,

1    I -- I get the point about the risk of providing examples,

2    and -- and making sure the jury understands that it's not

3    limited to those examples.  But it does seem to me it's things

4    like MPEGs, MP3's or audio or video files.  And how that gets

5    framed I'd have to figure out.  But it does strike me that

6    that's -- appears to be the key disconnect in the parties'

7    positions, but the construction that you propose, in my view,

8    is just --

9                    (Simultaneous colloquy.)

10           **THE COURT:**    -- reasonably broad given the statements

11    in the specification.

12           **MR. HOGGE:**  Fair enough, Your Honor.

13        So the issue really comes down to what is meant by

14    "media," and you think it really is just an audio file or a

15    video file and it couldn't be other kinds of media.

16        I would submit and ask Your Honor to consider the fact

17    that it's claimed in a broad way.  And I don't think the

18    prosecution history or anything indicates that it should be

19    narrowed in any event.

20        There certainly is audio and video examples in the

21    specification.  Would one of ordinary skill in the art having

22    read the specification look at this digital media file and

23    then look at media and say what -- what's the media?  Is that

24    limited to audio or video?

25        It's just not limited that way in the claim, and absent

1   some other reason, I don't think it should be narrowed, but --

2   but that's certainly your province, Your Honor.

3        **THE COURT:**  Right.  But my point is neither side has

4   offered me anything to say -- you know, a declaration or

5   anything else, this is how one of ordinary kill in the art

6   would interpret the term.

7        **MR. HOGGE:**  I've -- Well, right.

8       I'm a big proponent of not using extrinsic evidence on --

9   on things like that.  I've tried to talk the other side out of

10   using an expert to come in and tell Your Honor what these

11   terms mean.

12       I -- These terms are -- are interpreted as a matter of

13   law.  You're uniquely situated and equipped to interpret these

14   terms in light of the specification.

15       And when I -- when I say, "in light of the specification",

16   I don't -- I don't mean -- we're -- are we going to import

17   things out of the specification into the claims?  Where does

18   that stop?  Where does that start?

19       And it's sort of -- and maybe we can talk about

20   definitions for a second.  You been given a whole bunch of

21   different definitions from dictionaries.  And the English

22   language is horribly imprecise.  Go look up a word, there's

23   seven definitions.

24       And as *Phillips* talks about, you pick a definition to make

25   sure its consistent with the specification but you don't pick

1    a -- a definition that you happen to like that's not in the

2    specification.

3        So the specification helps you decide which definition you

4    want to use.  So if "media" you think -- when you go to the

5    dictionaries means "digital" or "audio," I -- you know, and

6    from the definitions, that's going to be your construction.

7        But I'm -- I'm not trying to tell you -- I'm one of

8    ordinary skill in the art.  I'm not.  I'm worse than -- much

9    worse than that.  But that's where we come down.

10       We think that Dropbox and Egnyte's arguments fail because

11   there's no indication in the record for limiting "digital

12   media" to types or even single files.

13                    (Demonstrative published.)

14       **MR. HOGGE:**  It's inconsistent with the claim.  There

15   are different limitations in the claim that address format.

16   And we think that, again, exemplary language is inappropriate

17   and confusing to the jury, 'cause then they'll just say that,

18   look, what we're doing is -- is not the MPEG.

19       That's all I have on that, Your Honor.

20          **THE COURT:**  All right.

21                    (Demonstrative published.)

22       **MR. HARBER:**  Your Honor, on this term, I believe to

23   address kind of the issue that you just flagged about there

24   not being expert testimony and kind of where are these coming

25   from, I think actually how this played out is that both sides

1    went into the meet-and-confer thinking that "digital media

2    file" was something that could be given its plain meaning.

3    And when we saw what they were proposing as the plain meaning,

4    which as Your Honor points out, is completely untethered to

5    what's being described in the specification, I think that's --

6    our proposed construction is an attempt to respond to that.

7         And we -- we really see that being two concerns with their

8    construction, which I think were -- were echoed by Your Honor,

9    and I think those are addressed by -- by our construction.

10        One is the -- the -- the fact that in their

11   construction -- take a -- step back from the issue of what

12   kind of a file is digital media.  Is it graphics?  Is it

13   video?  Or is it audio?  Is it something else?

14        Their construction doesn't even require a digital media

15   file to be a digital media file.  It is a file that contains

16   digital media.  So if you had a database file that had a video

17   in it or if you had a Word document that had a video that was

18   part of that file, that would be part of their construction,

19   even though that is not a digital media file either in common

20   usage or in -- in the patent specification.

21            THE COURT:  Right.  But here -- and just the --

22   problem I'm having is the same one I was discussing with

23   Mr. Hogge, which is "plain-and-ordinary meaning" simply means

24   what one of ordinary skill in the art at the time would

25   understand.  I've not been offered any evidence on that point

 1    one way or the other.

 2         The parties are essentially calling this

 3    "plain-and-ordinary meaning", but then you're -- it's really

 4    not.  It's -- You're trying to construe the term based on a

 5    reading of the specification.  It's just there's a disconnect.

 6         If it's really plain-and-ordinary meaning, I think what I

 7    would prefer to do is know what a person of ordinary skill in

 8    the art would have found the ordinary meaning to be at the

 9    time and use that as the basis.

10         It's just -- It seems to me what I'm being asked to do is

11    not really a plain-and-ordinary meaning construction.

12              **MR. HARBER:**  Fair enough, Your Honor.  And I think --

13                   (Demonstrative published.)

14              **MR. HARBER:**  -- what -- the point that -- that Your

15    Honor made that I think we're in agreement with and whether

16    you call that "plain-and-ordinary meaning" or you call it

17    defining the term as it's used in the specification, the

18    specification only talks about audio and video being digital

19    media files.

20         And it -- the last portion of the spec that's -- that's

21    cited here on the screen is from the background of the

22    invention.  And what it's saying -- it's distinguishing

23    digital audio and video, what's -- what's described here, are

24    becoming mainstream as mainstream as text and graphics are on

25    the Worldwide Web.

1      So it is explicitly -- the specification is explicitly

2  distinguish audio and video, which are digital media, from

3  text and graphics, which are other kinds of files.  I think

4  this provides the information that is needed.

5      This is not some specific embodiment.  This is -- I

6  believe it's either the summary or the background of the

7  invention that's describing the purported need for what's --

8  what's claimed here.

9      The -- The point -- the other point about, you know, do we

10  use examples.  I think your -- Your Honor was -- was right.

11  We put in the examples because we feel it's important given

12  what Synchronoss has suggested they think the meaning is to

13  convey what a digital media file is.  All of these examples

14  are examples that are used in specification.

15      To the extent the concern is are we going to improperly

16  argue to the jury that if you have another kind of video or

17  audio file that is not an MP3 or an MPEG that that's not

18  digital media, Your Honor is perfectly capable of preventing

19  us and ensuring that we don't do that at trial, so I don't

20  think that's a concern.

21      I think -- Again, what our -- our construction, I think,

22  is consistent with what the specifications is saying a digital

23  media file is.  And it provides examples as context.  And we

24  think that's particularly important here given what

25  Synchronoss is trying to do with the patent.

1          So that's -- Whether you preface that by the words

2    "plain-and-ordinary meaning" or not, we think that's the

3    appropriate definition in the context of the claims of the

4    patent.

5          **THE COURT:**  All right.  And then the trick, of

6    course, becomes if there's some feature in the accused

7    products that didn't exist at the time and isn't quite an MP3

8    or an audio file or a video file, it's some hybrid, new

9    format, how do we avoid the risk of the jury simply saying,

10   well, it's not any of the examples so therefore there's no

11   infringement?

12         **MR. HARBER:**  I think depending on what the -- how the

13   evidence develops on that, the -- there -- for example, what

14   would have to happen is there will be expert testimony.  There

15   will be information about the systems that -- evidence in the

16   record.  There will be expert testimony about how those map

17   onto the claims.  And it will be clear where the parties'

18   dispute is about whether some file constitutes a digital media

19   file.

20         If it is -- we think it should be addressed by this

21   construction that we've offered.  If it is not, it can

22   being -- if there is some issue at a later time, obviously

23   we -- there could be a further claim construction hearing or

24   motion before Your Honor just to address that issue, or if --

25   if the concern is that the jury is going to say, well, it's an

1    MP4 file which is a new kind of music file as opposed to an

2    MP3, we don't think that infringes, I think Your Honor is

3    perfectly capable of addressing that either through

4    instructions to us not to -- to make that argument or through

5    a jury instruction explaining that these are merely examples

6    and are not meant to limit the scope of what the claim is.

7    They're simply to provide assistance to you in determining

8    what a digital media file is.

9         **THE COURT:**  All right.  Well, here's what I would

10    suggest on this one.

11       I -- I think if the parties really want a

12    plain-and-ordinary meaning construction and they're asking me

13    to determine what plain and-and-ordinary meaning was to

14    someone of ordinary skill in the art at the time, then you

15    should submit evidence on that point.

16       If you're not seeking that and you're simply seeking a

17    construction along the lines of what you have proposed, then

18    you can tell me that.

19       But I would, I think, be in a position to conclude based

20    on the arguments that have been presented that the

21    understanding of a person of ordinary skill in the art at the

22    relevant time was either one of your proposals or something

23    else.

24       There's just no -- I haven't been given any backup for

25    that, so let's say within two weeks, you can either submit

1    support for your assertion that the plain-and-ordinary meaning

2    at the time was proposed, or you can say we're declining to do

3    that.  We're seeking just a construction as set out in our

4    papers and not tethering it to plain-and-ordinary meaning.

5         MR. HARBER:  Thank you, Your Honor.  We can do that.

6         THE COURT:  All right.

7    Last -- last term.

8              (Demonstrative published.)

9         MR. HOGGE:  Thank you, Your Honor.

10   The last term is "web browser."  And that occurs in the

11   '446 patent, claims 1 and 11.  Our construction is "A software

12   application that allows a user access to an information store

13   on the Worldwide Web."

14   And their construction is "A software application such as

15   Microsoft Internet Explorer for viewing and interacting with

16   web pages on the Worldwide Web."

17   And, of course, I've got a page on the dispute, 102 --

18             (Demonstrative published.)

19        MR. HOGGE:  -- of the slide deck.  The term is not

20   limited to specific types of web browsers.  And we think that

21   exemplary language is wrong and confusing.

22   For example -- and "web pages" is the primary dispute for

23   interacting with multiple web pages on the Worldwide Web.

24   The -- For example, if one was to download, the CNN app, it is

25   a web browser, but it's only going to go to the CNN site.

1    The claim term is shown used in claim 1 and 11 in the

2  following pages.

3                    (Demonstrative published.)

4        **MR. HOGGE:**  For example, in claim 1 on slide 103, "A

5  sync request made from a web browser at a (sic)

6  network-coupled apparatus by the user."

7      Similarly used in claim 11.

8        **THE COURT:**  Did the defendants inaccurately cite your

9  proposed definition of "web browser" from the other case?

10        **MR. HOGGE:**  I -- they inaccurately cite -- I don't

11  think so.  I think that was --

12      That was never ruled upon, Your Honor, in our defense.

13  And it was part of a give-and-take that didn't complete (sic)

14  with itself, and that's --

15                    (Pause in the proceedings.)

16        **MR. HOGGE:**  Oh, they cited NewBay's?  That was the

17  NewBay --

18                    (Off-the-record discussion.)

19        **MR. HOGGE:**  It was NewBay's construction.  Yeah, that

20  was NewBay's construction, which is RIM's construction.

21        **THE COURT:**  But I thought that your proposed

22  construction in that case was quite similar to the one that's

23  being advanced now.

24                    (Off-the-record discussion.)

25        **MR. HOGGE:**  Can you come up here and you want to

1    respond to His Honor?

2          MR. JACKSON:  Yes, Your Honor.

3       Yes, it was similar, but this was -- I mean, keep in mind

4    this was four or five years ago before the reexamination.

5    We've cited case law -- intervening for why the exemplary

6    language is inappropriate.

7          THE COURT:  Okay.

8       So setting aside, though, the exhibit, if I took out the

9    "such as Microsoft Internet Explorer," which it doesn't seem

10   to be particularly important in the bigger picture, how --

11         MR. JACKSON:  So --

12         THE COURT:  How --

13         MR. JACKSON:  Well --

14         THE COURT:  -- talking out of one side of your mouth

15   in that litigation and a different side here.

16         MR. JACKSON:  Sure.  In -- In the *NewBay* litigation,

17   the "with web pages on" was not part of Synchronoss's proposed

18   construction.  So if you were to take out the exemplary

19   language and to use Synchronoss's proposed construction from

20   the *NewBay* case, it would read, "Software application for

21   viewing and interacting with the Worldwide Web," which isn't

22   all that different, in all honesty, than our proposed

23   construction, which is directly from the --

24               (Off-the-record discussion.)

25         MR. JACKSON:  -- directly from the specification.

1          THE COURT:  All right.  So let me just stop you

2      there.

3          MR. JACKSON:  Sure.

4          THE COURT:  Dropbox, if that were the construction,

5      would you have problem with it?

6          MR. HARBER:  Well, I think the issue is, Your Honor,

7      the -- the construction must make clear that what a web

8      browser -- a web browser must be capable of browsing the web.

9          And I think as long as there's clarity on the record that

10     that's what it means, we're fine with that construction.

11         But what we're concerned about is the statement that

12     Mr. Hogge just made that the CNN app is a web browser.  No

13     person of ordinary skill in the art thinks the CNN app is a

14     web browser.  It does not -- it is not capable of browsing the

15     web.

16         So that -- that's our concern.  Setting up down the road,

17     if there's an agreement that that's not part of the

18     construction, then we're fine with that language as amended.

19     We just think it's important to make that distinction.

20         THE COURT:  All right.

21         And so just trying to think ahead to how this actually

22     plays out in a trial.  Again, I don't think here we need the

23     exemplary Microsoft Internet Explorer, but if I took that out,

24     your construction would be "Software application for viewing

25     and interacting with web pages on the Worldwide Web."

1   And that excludes the CNN app because what?  It permits

2   interaction with multiple web pages not just the one

3   associated with the app?

4   **MR. HARBER:**  I think the point is that it's got to be

5   capable of browsing the web.  And that's what we're trying to

6   convey with this language.  We thought we could simplify

7   matters by using language essentially that they'd used in

8   their past case, but the -- the essence of a web browser is

9   that it browses the web.

10   The -- An app -- And I think where this -- Where this

11   comes up at trial and is likely to come up at trial is, as we

12   conveyed in our brief, is, we believe that the -- there will

13   be an attempt made here to show that the proprietary apps like

14   the Dropbox app are web browsers because they may use http to

15   connect to the Dropbox database.

16   There is not a person of ordinary skill in the art that

17   you can find who thinks the Dropbox app is a web browser.  So

18   that -- we just want to make sure that that dichotomy is

19   clear, whatever the form of the words that -- that do that.

20   **THE COURT:**  Well, I get it, but I don't have time to

21   redraft your proposals if I don't need to.

22   I mean, maybe you need to further meet and confer and see

23   if there's some language that gets at what -- what you're

24   saying and is acceptable to the other side.

25   I get what the ultimate dispute is going to be.

1          **MR. HARBER:**  Right.

2          **THE COURT:**  The question is I'm not sure that the

3     language that I've been given is likely to obviate that

4     dispute or drive a decision one way or the other.

5          And so if you're trying to do that, I think you probably

6     need to figure out a way to do that.

7          **MR. HARBER:**  So I would suggest, Your Honor, that --

8     and, again, we -- we used this language because it's basically

9     verbatim from what they've used in the past so we thought we

10    would be able to narrow the dispute, but they've thrown that

11    overboard so it hasn't done that.

12         I think what we think is the proper definition of this is

13    "a software application for browsing the web."  That is simple

14    language.  It's consistent with what Dr. Freedman explains in

15    his -- his declaration in support of this term.  It's

16    consistent with what's used in the specification.  It's

17    supported by the same evidence.

18         And I think that -- if that's a clearer way to get at this

19    dispute.  I don't -- I don't think that we're going to agree

20    on a definition because I think we have different views of

21    what the claim covers.

22         **THE COURT:**  Understood.

23         So then what does "browsing" mean?

24         **MR. HARBER:**  It means being able to look at multiple

25    web pages.  You go on and you can go to cnn.com, or you can go

1    to, you know, carfax.com -- you can go to different places.

2    It's not just a portal that happens to use http to connect to

3    a specific location.

4         THE COURT:  All right.  So I see.

5      So in that way, the construction of "viewing and

6    interacting with web pages on the Worldwide Web" probably

7    resolves the dispute.

8         MR. HARBER:  We think so.  We also -- if you prefer

9    simpler language, I think what I proposed is also -- we would

10    be amenable to that, but that's the underlying issue.

11         THE COURT:  Yeah, it just begs the -- saying "browse"

12    then begs the question, well, what does "browse" mean.

13         MR. HARBER:  Right.

14         THE COURT:  All right.

15      Plaintiffs --

16         MR. HARBER:  -- by the way, is why I think that the

17    exemplary language -- if Your Honor doesn't feel it's

18    appropriate to use the exemplary language, that's fine.  I

19    think that's part of what helps address the issue here given

20    the dispute.

21         THE COURT:  All right.

22         MR. HOGGE:  We've cited language in the specification

23    supporting our definition, Your Honor.  And that's in column

24    7, lines 52 to 54 on -- in the callout on slide page 105.

25      Specification says in Fig. 3, a user --

1              (Off-the-record discussion.)

2         **MR. HOGGE:**  "In Fig. 3, a user 550 interacts with,

3    for example, a browser application 100 such as a Worldwide Web

4    browser which allows the user access to an information store."

5         And so that's where we come up with our definition, "A

6    software application that allows a user access to an

7    information store on the worldwide web."  "An information

8    store."  That's -- That's from the specification.

9         And so you're going to get down to what is a browser, you

10   can go to the single site of CNN and browse all their URL's

11   with that CNN app, so that's going to be -- it's, like, well,

12   it must be capable of browsing many -- different URL's of

13   different people and all this sort of stuff.

14        Well, the specification says it just needs to allow a user

15   access to an information store.

16        **THE COURT:**  Right.

17        And "information store" is defined in the patent as any

18   public or private storage server coupled to a network such as

19   for example, the Internet."

20        So is it your view that a web browser could allow access

21   to an information store completely detached from the Internet?

22   Because that doesn't seem like a realistic reading at all.

23        **MR. HOGGE:**  No.  I think the Worldwide Web is part of

24   that claim.  I mean, I've looked at that, so that's clearly

25   part of the claim.  It's a wide-area network.

1     But keeping in mind that what we're talking about is

2   syncing point A and point B.  And they are separated by and on

3   the web.  And so to get to sync point A -- point B with point

4   A, you have to be able to open your browser, get to point B

5   where the information store is and then sync that.

6     That's basically the thing we're getting far and wide with

7   the discussions of what that browser's supposed to be able to

8   do.  It's -- Nobody's opening up a Windows Explorer and then

9   syncing to the universe.

10     But be that as it may -- and I take that back, because we

11   did have a Flicker app, and you could sync to the Flicker app,

12   and that is defined as a device.

13     Anyway, we suggest that our construction is supported by

14   the specification.  And their exemplary language is

15   inappropriate.

16     And I did want to say that the idea that we can end this

17   and have you further litigate down the field how to control

18   people if they want to have exemplary language in the

19   construction, we are talking about a jury instruction here.

20     I don't want to have to litigate that further on in -- in

21   the case.  And so we should go ahead and get that done.

22     Anyway, that concludes my statement, Your Honor.

23         **THE COURT:**  All right.  Submitted?

24   I'll issue a claim construction order as soon as I can.

25         **MR. HOGGE:**  Thank you, Your Honor.

1      **MR. HARBER:**  Thank you, Your Honor.

2          (Proceedings were concluded at 12:36 P.M.)

3                       --oOo--

4

5

6              **CERTIFICATE OF REPORTER**

7

8          I certify that the foregoing is a correct transcript

9      from the record of proceedings in the above-entitled matter.

10     I further certify that I am neither counsel for, related to,

11     nor employed by any of the parties to the action in which this

12     hearing was taken, and further that I am not financially nor

13     otherwise interested in the outcome of the action.

14

15     _____

16          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

17                Monday, November 6, 2017

18

19

20

21

22

23

24

25